764 So.2d 215 (2000)
James S. KYSER, Plaintiff-Appellant,
v.
METRO AMBULANCE, INC., American Medical Response, Defendants-Appellees.
No. 33,600-CA.
Court of Appeal of Louisiana, Second Circuit.
June 21, 2000.
*216 Law Offices of Richard L. Fewell, Jr. by Byron K. Kitchens, West Monroe, Counsel for Appellant.
Hayes, Harkey, Smith & Cascio by Thomas M. Hayes, III, Karen L. Hayes, Monroe, Counsel for Appellees.
Before STEWART, GASKINS and DREW, JJ.
DREW, J.
James Kyser, III appeals a judgment granting a motion for summary judgment in favor of American Medical Response and Metro Ambulance, Inc.
We affirm.

FACTS
On the evening of March 7, 1997, Mary Jane Robison, Kyser's girlfriend, went to his home. She discovered the 52-year-old Kyser lying face down on his living room floor. He was making a gurgling sound and his mouth was bloody as a result of biting his tongue. Kyser's eyes were not focusing, and while he moved a little, he did not respond to Robison, so she called 911. First to respond were Chief Artie McMullen and Richard McDowell of the Ouachita Parish Fire Department. A deputy sheriff also came to the residence. Kyser was not fully conscious and was still face down on the floor when the firemen arrived.
Responding to the dispatch for Metro Ambulance, Inc. were Steve Harrison, an emergency health care technician certified at the paramedic level, and William Nugent, an emergency medical technician basic ("EMTs"). Harrison and Nugent were dispatched at 7:14 p.m. and they arrived at Kyser's home at 7:19. They found Kyser on the floor, but he was conscious. Robison could not recall if Kyser was still face down when the EMTs arrived.
Harrison asked Kyser his name, if he was all right, what had happened, his date of birth, his prior medical history, and what medications he was allergic to. Kyser told Harrison that he was fine and did not want medical treatment. Although Kyser refused oxygen, he consented to Harrison's request to take his vital signs, which Harrison took while Kyser remained on the floor. His pulse and blood pressure were abnormal. Harrison commented to Robison that Kyser's blood pressure was extremely high and that his pulse was much too fast. After having his vital signs checked, Kyser sat up on the floor. When Harrison asked Kyser if he wanted to be taken to the hospital, Kyser again said he was fine and that he did not want to go. Harrison asked Kyser if he was sure, and Kyser again replied that he was fine and did not want to go to the hospital. Kyser eventually got up from the floor under his own power before sitting down on a sofa.
Because Kyser refused medical treatment or to be transported to the hospital, Harrison adhered to refusal protocol, which suggests contacting medical control for instructions when there is a reasonable basis to suspect lack of mental capacity to refuse consent. Harrison telephoned the emergency room physician at Glenwood Hospital. After being advised of the situation, the physician told Harrison to accept *217 the refusal. Harrison then had Kyser sign a refusal of service form. According to Robison, when she pleaded with the EMTs to take Kyser, they asked her if she was a relative, and when she said no, they told her they could not take him without his consent. Harrison and Nugent left Kyser's home at 7:34 p.m.
When Robison was asked why she did not attempt to force Kyser to get into her car so she could take him to the hospital, she responded that she wanted to wait for his parents to make that decision. Kyser's parents did come to his home later that evening. According to Robison, Kyser was more coherent by the time his parents arrived. They did not urge him to go to the hospital, even after Robison told them that she felt that Kyser should go. Kyser also told his parents that he did not want to go to the hospital.
Robison stayed with Kyser that night. Kyser awoke during the night complaining of a bad headache. She gave him an aspirin and he returned to sleep. She called his parents the next morning to tell them he was not doing well. Kyser soon awoke and vomited in a sink. Robison then witnessed Kyser experiencing what she called a seizure. Robison recalled that Kyser lost control of his ability to speak, began having involuntary muscle movements and braced himself against a cabinet before collapsing to the floor. She again called 911. Different EMTs responded and Kyser was brought to the hospital. Kyser had suffered a ruptured aneurysm. He has since had several small strokes.

PROCEDURAL HISTORY
James Kyser filed a petition for damages against Metro Ambulance, Inc. ("Metro") and American Medical Response ("AMR") on April 3, 1998. Metro is a subsidiary of AMR. Kyser alleged that Metro was negligent in: (i) failing to provide medical care to him; (ii) allowing him to execute a refusal of service even though he was incapable of intelligently doing so; (iii) failing to take the necessary steps to evacuate him from his residence and transport him to a local health care facility for examination and treatment; and (iv) falling below the standard of care as required under the circumstances that existed on March 7, 1997.
Metro and AMR asserted in their answer that they are immune from liability pursuant to La. R.S. 40:1233. A motion for summary judgment was filed by Metro and AMR on February 8, 1999. Submitted in support of the motion were the emergency response report, affidavits from Harrison, Nugent and Fireman Richard McDowell, and excerpts of the deposition testimony of Kyser and Robison. Kyser attached responses to requests for production, his own deposition and the depositions of Robison and Nugent to his opposition to summary judgment.
Judgment granting the motion for summary judgment was rendered on August 31, 1999. Applying La. R.S. 40:1233(A)(1), the trial court found that the record disclosed a lack of any evidence in support of Kyser's burden of proving defendants' gross negligence.

DISCUSSION

Application of La. R.S. 40:1233
Kyser argues in his first assignment of error that the trial court erred in applying La. R.S. 40:1233(A)(1) to the facts of this case.
La. R.S. 40:1233, which was designated as La. R.S. 40:1235 at the time of this incident, provides, in part:
§ 1233. Civil immunity
A. (1) Any emergency medical person certified pursuant to the provisions of this Subpart who renders emergency medical care to an individual while in the performance of his medical duties and following the instructions of a physician shall not be individually liable to such an individual for civil damages as a result of acts or omissions in rendering the emergency medical care, except for acts or omissions intentionally designed to *218 harm, or for grossly negligent acts or omissions which result in harm to such an individual. Nothing herein shall relieve the driver of the emergency vehicle from liability arising from the operation or use of such vehicle.
(2) The immunity granted to emergency medical personnel by the provisions of this Subpart shall extend to parish governing authorities, police departments, sheriffs' offices, fire departments, or other public agencies engaged in rendering emergency medical services and its insurers with respect to such emergency medical services unless the emergency medical personnel employed by such agencies would be personally liable under the provisions of Paragraph (1) of this Subsection.

* * * * *
Kyser, noting references to "person" and "individually" in (A)(1), argues that the limited immunity provided in La. R.S. 40:1233(A)(1) applies only to Harrison and Nugent. He additionally argues that (A)(2) extends the limited immunity in (A)(1) only to entities which are "parish governing authorities, police departments, sheriff's offices, fire departments or other public agencies engaged in rendering emergency medical services and its insurers[.]" The statute is clearly silent as to private employers.
In support of his position, Kyser cites Matlock v. Hankel, 96-1838 (La.App. 4th Cir.2/11/98), 707 So.2d 1016, writ denied, 98-0594 (La.4/24/98), 717 So.2d 1172. Matlock was injured when she was struck by a vehicle driven by Hankel, a volunteer fireman, who was driving to a fire. Matlock settled with Hankel and his insurer, and proceeded to trial against, among others, the Fort Pike Volunteer Fire Department ("FPV"). FPV appealed the trial court's finding of FPV's vicarious liability. In rejecting FPV's argument, the Fourth Circuit stated:
FPV also argues that it is immune from liability in this case under La. R.S. 37:1735. That statute provides:
A. Any volunteer fireman who renders emergency or rescue services while in the performance of his duties at the scene of a fire shall not be individually liable for civil damages as a result of acts or omissions in rendering the emergency or rescue services. The immunity provided herein shall apply to all acts or omissions except those intentionally designed to harm or those grossly negligent acts or omissions that result in harm to person or property.
B. As used in this Section, "volunteer fireman" means any person who is a member of an organized volunteer fire department and who acts according to his duties as a fire fighter.
La. R.S. 37:1735 (emphasis added). The use of the phrase "individually liable" in the emphasized portion of the above quotation of the statute makes it clear that, while perhaps Mr. Hankel might have attempted to claim this immunity (an issue we do not decide), FPV cannot.

Id., 707 So.2d at 1020.
Employers are answerable for the damage caused by their employees in the exercise of the functions in which they are employed. La. C.C. art. 2320. This article imposes the liability of the employee on the employer through vicarious liability. The employee's liability is based on his act or omission and the employer's secondary and derivative liability is imposed by law on the basis of the relationship. Narcise v. Illinois Cent. Gulf R. Co., 427 So.2d 1192 (La.1983). Therefore, except for independent tortious acts otherwise committed by the employer, an employer can only be held liable (through vicarious liability) if his employees are found liable in the first instance.
An employer and an employee are solidarity liable for damages caused by the employee's tortious acts. Narcise v. Illinois *219 Cent. Gulf R. Co., supra; Charleston v. Berry, 97-2527 (La.App. 1st Cir.12/28/98), 723 So.2d 1069. La. C.C. art. 1801 provides:
A solidary obligor may raise against the obligee defenses that arise from the nature of the obligation, or that are personal to him, or that are common to all the solidary obligors. He may not raise a defense that is personal to another solidary obligor.
We must determine whether the limitation on liability established in La. R.S. 40:1233 is a personal defense for EMTs or one that arises from the nature of the obligation and can be raised by their private employers such as AMS and Metro. Personal defenses bar a right of action where a cause of action would have otherwise existed. Descant v. Administrators of Tulane Educational Fund, 93-3098 (La.7/5/94), 639 So.2d 246. Immunity from liability destroys a plaintiff's substantive cause of action against the immune party, while immunity from suit restricts the plaintiffs right to sue the defendant. Id., supra. Personal defenses are also granted to all members of a specific class and do not depend upon the nature of the accident. Id., supra.
La. R.S. 40:1233 does not grant emergency medical personnel immunity from suit, only immunity from liability under certain circumstances. First, the EMT must be rendering emergency medical care to an individual while in the performance of his medical duties. Second, the EMT must be following the instructions of a physician. Third, the immunity from liability does not apply to acts or omissions intentionally designed to harm, or for grossly negligent acts or omissions which result in harm to such an individual. La. R.S. 40:1233 does not provide a personal defense and its limitation on liability arises from the nature of the obligation. This defense is available to a private ambulance service solely when the liability of the private ambulance service is premised on the liability of its emergency medical person (a solidary obligor) who could raise the defense.
In Smith v. Our Lady of the Lake Hosp., Inc., 93-2512 (La.7/5/94), 639 So.2d 730, a surgeon whose staff privileges were terminated by a hospital sued several members of peer review committees, the corporation of his chief competitor and the hospital. Dismissing the suit on summary judgment, the trial court found that all the defendants were entitled to immunity from liability under La. R.S. 13:3715.3(C), which granted qualified immunity to peer review committee members. The court of appeal reversed. Affirming that part of the court of appeal's judgment relating to claims against the competitor corporation, the hospital and claims for injunctive relief, the supreme court stated:
Our analysis of the statute, however, reveals that, by its plain terms, it extends its protection only to certain claims and to certain defendants.... As to defendants, the statute extends only to individuals, i.e., peer review committee members, not to entities, and thus, as a matter of law, cannot preclude Dr. Smith's claims against either the hospital, OLOL, or Dr. Berry's professional corporation, CVT. Hence, summary judgment on the injunctive claims and in favor of OLOL and CVT is thus precluded.

Id., 639 So.2d at 745.
Justice Lemmon, in his concurrence, added:
However, once the individual staff members and doctors are dismissed by summary judgment based on the immunity conferred by La. 13:3715.3C, the corporate defendants who acted through the released individuals may be entitled to summary judgment on other grounds. Rehearing applicants may raise the issue by another motion for summary judgment.

Id., 639 So.2d at 755.
Our emphasis.
*220 On remand, the trial court denied a joint motion for summary judgment by the defendants. The supreme court reversed the trial court:
Judgment of the trial court denying defendants' joint motion for summary judgment is reversed. In light of this court's summary dismissal of all damage claims against the individual defendants in Smith v. Our Lady of the Lake Hospital, 93-2512 (La.7/15/94), 639 So.2d 730, coupled with the purely derivative nature of all the damage claims asserted against the two corporate defendants, Our Lady of the Lake Hospital, Inc., d/b/a Our Lady of the Lake Regional Medical Center (OLL), and CVT Surgical Center, A Medical Corporation (CVT), we conclude that these two corporate defendants, which acted through the released individual defendants, are entitled to summary judgment on the damage claims as a matter of law. See Smith, 93-2512, p. 36 (La.7/15/94), 639 So.2d at 756 (Lemmon, J., concurring).

Smith v. Our Lady of the Lake Hosp., 96-1837 (La.9/27/96), 680 So.2d 1163, rehearing denied, 96-1837 (La.11/8/96), 683 So.2d 258.
The trial court was correct in determining whether or not AMR and Metro are liable for purposes of summary judgment by first examining whether the record disclosed any evidence in support of Kyser's burden of proving the gross negligence of Harrison and Nugent. This assignment of error is meritless.

Summary Judgment
Kyser next contends that summary judgment was improperly granted because Robison's deposition testimony contradicts the contentions of the EMTs that Kyser was competent to refuse medical transport that evening. There is no dispute that Kyser refused medical services after repeated requests by the EMTs and begging by his girlfriend Robison.
We review summary judgments de novo under the same criteria which govern the trial court's determination of whether summary judgment is appropriate. Shoemaker v. City of Shreveport, Emergency Medical Services, 31,692 (La.App.2d Cir.2/24/99), 728 So.2d 1031.
The summary judgment procedure is favored and is designed to secure the just, speedy, and inexpensive determination of every action allowed by law. La. C.C.P. art. 966(A)(2). Summary judgment is properly granted if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to material fact, and that the mover is entitled to judgment as a matter of law. Art. 966(B). A fact is material if its existence or nonexistence may be essential to the plaintiff's cause of action under the applicable theory of recovery. Curtis v. Curtis, 28,698 (La.App.2d Cir.9/25/96), 680 So.2d 1327.
If the movant will not bear the burden of proof at trial on the matter that is before the court on the motion for summary judgment, the movant is not required to negate all essential elements of the adverse party's claim, action, or defense. Instead, the movant need only point out to the court that there is an absence of factual support for one or more elements essential to the adverse party's claim, action, or defense. If the adverse party then fails to produce factual support sufficient to establish that he will be able to satisfy his evidentiary burden of proof at trial, there is no genuine issue of material fact. Art. 966(C)(2).
Further, La. C.C.P. art. 967 provides, in part:
When a motion for summary judgment is made and supported as provided above, an adverse party may not rest on the mere allegations or denials of his pleading, but his response, by affidavits or as otherwise provided above, must set forth specific facts showing that there is a genuine issue for trial. If he does not so respond, summary judgment, if appropriate, shall be rendered against him.
*221 According to La. R.S. 40:1233, in order to recover, Kyser must prove the EMTs intentionally harmed Kyser or were grossly negligent in their acts or omissions. Our supreme court has detailed the various meanings of gross negligence:
Louisiana courts have frequently addressed the concept of gross negligence. Gross negligence has been defined as the "want of even slight care and diligence" and the "want of that diligence which even careless men are accustomed to exercise." State v. Vinzant, 200 La. 301, 7 So.2d 917 (La.1942). Gross negligence has also been termed the "entire absence of care" and the "utter disregard of the dictates of prudence, amounting to complete neglect of the rights of others." Hendry Corp. v. Aircraft Rescue Vessels, 113 F.Supp. 198 (E.D.La.1953) (applying Louisiana law). Additionally, gross negligence has been described as an "extreme departure from ordinary care or the want of even scant care." W. Page Keeton, et. al., Prosser & Keeton on the Law of Torts, § 34, at 211 (5th ed.1984); 65 C.J.S. Negligence, § 8(4)(a), at 539-40 (1966 & Supp.1993). "There is often no clear distinction between such [willful, wanton, or reckless] conduct and `gross' negligence, and the two have tended to merge and take on the same meaning." Falkowski v. Maurus, 637 So.2d 522 (La.App. 1st Cir.), writ denied, 629 So.2d 1176 (La.1993) (quoting Prosser & Keeton, supra, at 214)). Gross negligence, therefore, has a well-defined legal meaning distinctly separate, and different, from ordinary negligence.

Ambrose v. New Orleans Police Dept. Ambulance Service, 93-3099 (La.7/5/94), 639 So.2d 216, 219.
Kyser does not remember anything from the moment he fell on March 7 until he woke up in the hospital days later. Therefore, he relies entirely on Robison's memory and version of events. The parties do not dispute that Kyser consistently refused Harrison's repeated offers of medical treatment and transport to a hospital. Robison testified that Kyser indicated to everyone that he did not want to go to the hospital, and he even ignored his girlfriend's pleadings. This is consistent with Robison's description of Kyser as a person who is never sick, never admits to being hurt and never considers medical attention.
Primarily in dispute are Kyser's allegations, based upon what Robison witnessed, that he exhibited symptoms which should have indicated to Harrison and Nugent that he was not capable of refusing medical transport and treatment.
Robison insisted that Kyser was not speaking clearly when responding to the EMTs, that he mumbled his answers and was not speaking normally. She related that Kyser's answers were not full words and that he sometimes would make noises for answers. She could not recall him giving any distinct, clear answers. Robison remembered that Kyser expressed his desire not to go to the hospital by shaking his head and muttering a negative response. Robison believed that Kyser was unable to speak coherently while Harrison and Nugent were present. Regarding Kyser's speech that evening, Robison testified:
Q: Did Mr. Kyser tell you how he was feeling while they were there?
A: No. He did not make any sentences. He did not make any complete clear sentences or words.
Q: He didn't say words that you understood?
A: That were completely clear, no.
Q: Give me an example.
A: For "no," he would indicate no by saying "uh-uh" or he's He's always been a person who speaks very clearly. He says "yes." He says "no." He doesn't say "uh-uh" or "uh-huh." He speaks clearly. That's just his demeanor, his way of handling things. And he didn't that night.
*222 Robison disputed the significance of the signed refusal of service, contending that Harrison never read the form to Kyser or asked Kyser to read it. Nugent did not know if Kyser read the refusal of service or if Harrison read the refusal to him. However, Nugent testified that Kyser did not have any difficulty in signing his name.
Robison agreed that Harrison and Nugent were attentive to Kyser, that they were genuinely interested in providing help to him and that they encouraged him to go to the hospital. While she disagreed that they tried to talk him into going to the hospital, she agreed that they asked Kyser many times if he would go to the hospital. Robison testified:
Q: Did they tell him he ought to go to the hospital?
A: I'm not sure if they told him that-in those words. They told me that he really needed to go because he did not respond.
Q: Did they say things like, "We need to take you" or "You need to go"?
A: No. Their words were more like, "You should go."
Q: Okay. And I believe you've already told me more than once, and I'll not go through it again, but every time he was told something along those lines, he gave a negative response?
A: He did.
Harrison stated in his affidavit that he did not detect any slurring of speech, smell of alcohol or any other sign of incompetency. Kyser was able to answer all of his questions. When Harrison informed Kyser that his vital signs (blood pressure and pulse) were not normal and that he should be taken to a hospital and examined by a physician, Kyser refused treatment or transport. Kyser still refused treatment and transport even after Harrison stated he "strongly advised [Kyser] of the possible complications which could result from the condition indicated by his abnormal vital signs." Before leaving Kyser's residence, Harrison informed Robison that if Kyser changed his mind or became unconscious, they would come back and get him.
Nugent is an EMT basic whose responsibilities include driving the ambulance and assisting Harrison with his duties. Nugent was sure that Harrison told Kyser that his blood pressure was elevated and his pulse was high, but he could not recall what possible complications Harrison warned Kyser about. Nugent's affidavit was submitted in support of summary judgment. His deposition testimony was submitted in opposition to summary judgment. Nugent recalled that Harrison spent a considerable amount of time trying to convince Kyser to consent to transport. He also recalled that Kyser appeared to be alert and responsive. Kyser was oriented, understanding where he was, what time it was and who was with him. There was no indication to Nugent that Kyser did not have control of his mental faculties, nor did Kyser behave in any manner suggesting he was mentally incompetent. Kyser appeared normal, and he was not nervous or shaking. McDowell stated in his affidavit that Kyser showed no signs of being incompetent or not understanding what was taking place.
Nugent testified that Kyser's speech was not slurred when he was questioned by Harrison, and his answers were appropriate to the questions asked. Kyser was able to provide his own background information to Harrison. Nugent also testified that Kyser was able to form sentences. Nugent did not detect any paralysis on either side of Kyser's face or the inability of Kyser to fully use his mouth when speaking.
Nugent recalled that Kyser was cooperative most of the time he and Harrison were at Kyser's home, but that Kyser became agitated right before they left because Harrison persisted in trying to get Kyser to go to the hospital. Nugent testified that Kyser had been standing for four or five minutes before they left. He stood without assistance and without having to *223 lean on anything. Kyser was alert when they left his residence.
Robison admitted that Kyser's condition the next morning was much worse than the night before. He was unable to respond to the EMTs and was unaware of what was being done. According to Robison, Kyser was not conscious enough the next day to refuse service. The EMTs, a different group from the previous evening, did not ask for consent to transport before taking Kyser to the hospital.
La. R.S. 40:1234 limits EMTs in the medical services they can provide to an ill or injured person. In addition, Louisiana recognizes the right of an adult to refuse to consent to medical or surgical treatment as to his own person. La. R.S. 40:1299.56. EMTs must balance fulfilling a person's emergency medical needs with respecting a person's wish not to be treated or transported to the hospital. Kyser presented no evidence sufficient to show that he will be able to meet his burden of proof at trial that Harrison and Nugent, as employees of AMS and Metro, acted with gross negligence in leaving him in the care of Robison instead of taking him to the hospital. Kyser repeatedly refused requests from emergency personnel and his own girlfriend to be taken to the hospital. While Kyser was initially on the floor, by the time the EMTs departed, he was able to stand on his own. His parents did not even recognize a compelling need for Kyser to go to the hospital that evening. Based upon the documents submitted in support and opposition to summary judgment, it is apparent that the conduct of Harrison and Nugent cannot be characterized as exhibiting want of even slight care and diligence or want of that diligence which even careless men are accustomed to exercise. Therefore, AMS and Metro cannot be found liable for damages allegedly suffered by Kyser as a result of their employees' actions and inactions as those actions and inactions did not rise to the level of gross negligence. Summary judgment was properly granted.

DECREE
At appellant's cost, the judgment is AFFIRMED.