STATE OF LOUISIANA
COURT OF APPEAL, THIRD CIRCUIT

CW03-332

BILLY A. BROWNING, ET AL.

VERSUS

WEST CALCASIEU CAMERON HOSPITAL

**********

ON APPLICATION FOR SUPERVISORY WRITS FROM THE
FOURTEENTH JUDICIAL DISTRICT COURT
PARISH OF CALCASIEU, NUMBER 2002-0060
HONORABLE ALCIDE JOSEPH GRAY, DISTRICT JUDGE

**********

BILLIE COLOMBARO WOODARD
JUDGE

**********

Court composed of Billie Colombaro Woodard, Michael G. Sullivan, and Billy
Howard Ezell, Judges.

**WRIT DENIED.**

Steven Broussard
Broussard & Hart, L.L.C.
1301 Common Street
Lake Charles, Louisiana 70601
(337) 439-2450
Counsel for Plaintiff/Respondent:
    Billy A. Browning

P. Scott Jolly
Watson, Blanche, Wilson & Posner, L.L.P.
505 North Boulevard
Baton Rouge, Louisiana 70821
(225) 387-5511
Counsel for Defendant/Applicant:
    West Calcasieu Cameron Hospital

WOODARD, Judge.

The Defendant, West Calcasieu Cameron Hospital, asserts that the trial court should have granted its motion for summary judgment because the Plaintiffs did not submit evidence sufficient to support a medical malpractice claim. We deny the Defendant's writ.

* * * * *

On June 1, 1999, Mrs. Jewell Browning and her husband, Mr. Billy Browning, drove into Lake Charles to see a movie. According to Mr. Browning, his wife complained of pain in her left arm and shoulder on the way to the movie theater. He asked her if she needed to go to the hospital, but she allegedly responded: "Oh, it's just bursitis."

After the movie, they visited their daughter, Theresa Helton. At Theresa's house, they talked for a little while with Theresa and her husband. Afterwards, they went to visit their other daughter, Patricia Stump. On the way to Patricia's house, they stopped by Burger King, where Mrs. Browning had a Whopper and a soda. Soon after they arrived at her house, Patricia asked her mother if she wanted to go for a short walk around the neighborhood. On the way back to the house, Mrs. Browning told Patricia that she was not feeling well.

When they got back to the house, Patricia remembered her mother saying "she was weak and hot." Patricia asked her if she wanted to go to the hospital, but she refused. Patricia called for an ambulance at 7:28 p.m. when her mother began throwing up.

It took approximately three minutes for an ambulance dispatched from West Calcasieu Cameron Hospital (WCCH) substation to arrive at the scene. The two ambulance attendants, Chris Weaver and Brent Andrepont, were EMT-Paramedics certified in CPR and ACLS (Advanced Cardiac Life Support). Chris was the driver of the ambulance, and Brent "took the lead." According to Chris, they "work as a team," but Brent did most of the interacting with Mrs. Browning and her family.

The initial ambulance-run-report Brent filled out indicates that Mrs. Browning needed an ambulance because she was experiencing "Syncopal Episodes" with nausea

1

and vomiting. During his deposition, he noted that "Syncopal" simply meant passing out or fainting. Another section of the report states the following:

> Present Finding: Upon arrival found 57 year-old caucasian female seated on couch. Noted vomitus on floor. Patient stated had eaten burger from Burger King approximately one hour prior to going for a walk. Patient denied any chest pain or any medical history. Patient stated that when she returned to the house, she became dizzy, light-headed, and nauseated. Husband stated he assisted her to the floor in kitchen. Patient's skin cool and diaphoretic [or sweaty]. Patient AOX3. Patient stated she felt she was fine after vomiting. Blood pressure was taken[.] . . . Patient again stated felt fine and refused transport to hospital for evaluation.

Brent explained that "AOX3" meant that, upon their arrival, Mrs. Browning was "alert and oriented times three, person, place, and time."

In addition to the symptoms listed in the report, Patricia alleges that her mother informed the paramedics that "she was having a hard time breathing." Mr. Browning also asserts that he told one of the paramedics on the scene that his wife felt a pain earlier that day in her left arm and shoulder.

When Brent and Chris arrived on the scene, Brent assessed the situation and took Mrs. Browning's pulse. However, according to Patricia and Mr. Browning, Patricia had to ask them to take her mother's blood pressure before Chris actually did so. After she vomited, Mrs. Browning told the paramedics she felt better, but Patricia noticed that "her face was growing pale." Then, Brent asked her about her medical history, after which he told Mrs. Browning that she probably suffered a heat related injury.

Mr. Browning said the paramedics kept telling his wife: "You're going to be all right, Mrs. Browning." When Brent asked for permission to transport her to a hospital, she refused. Even though there is conflicting testimony regarding the total number of times and the manner in which he asked her this, Mrs. Browning clearly refused any and all attempts made by the paramedics to transport her to a hospital.

Next, Brent asked Mrs. Browning to sign a form to document the fact that she refused transport. After the paramedics left, Patricia helped her mother into the bathtub. Mrs. Browning returned to the living room after her bath and laid down on the couch. Within a couple of minutes, she was gasping for breath and shaking. Patricia immediately called for an ambulance. The second ambulance-run-report

2

indicates that it was 8:00 p.m. when Chris and Brent returned. The second report also states the following:

> Present Finding: Upon arrival found 57 year-old caucasian female lying supine on couch pulseless [and hardly breathing]. No CPR in progress. Patient had been dizzy and nauseated earlier this evening. Patient moved to the floor. Cardiac monitor shows ventricular fibrillation. Patient is pale and [sweaty] but warm. Negative abdomen distention. Patient is incontinent. Pupils equal at four millimeters and non-reactive. No available history or findings at present.

Immediately, they placed Mrs. Browning on a cardiac monitor. At 8:06 p.m., the monitor recorded ventricular fibrillation which, according to Brent, meant her heart was "just quivering" and lost its normal rhythm. They started CPR and shocked her once. At 8:08 p.m., her regular heart rhythm had returned and her pulse progressively got better. They transported her to St. Patrick Hospital, where she died the following morning at 4:00 a.m. from a heart attack.

On November 22, 1999, the Plaintiffs filed a complaint with the Patient's Compensation Fund. On July 25, 2001, after reviewing all assertions of liability, a medical review panel unanimously held that the evidence presented did not support a conclusion that Chris Weaver, Brent Andrepont, or WCCH failed to comply with the appropriate standards of care.

On August 1, 2001, the Brownings filed a petition for damages with the trial court. They alleged that WCCH is liable for their EMTs' negligence: (1) in not obtaining and documenting Mrs. Browning's refusal according to WCCH's protocols; (2) in failing to warn her of the potential seriousness of her medical condition; (3) in failing to place her on a cardiac monitor on the first run; (4) in failing to transport her to a hospital on the first run; (5) in failing to assess her medical condition properly and completely; and (6) for any other acts of negligence proven at a trial on the merits.

WCCH responded by filing a pleading titled: "Exceptions of Non-Conformity, Improper Cumulation, No Right or Cause of Action, Res Judicata, Alternative Motion for Summary Judgment." The trial court determined that it should treat all of these claims as a single motion for summary judgment, which the court denied on February 10, 2003.

3

WCCH appeals, asserting that the trial court erred: (1) by failing to rule that it is entitled to immunity under La.R.S. 40:1233; (2) by not finding that the Brownings must produce expert evidence to substantiate a medical malpractice claim; and (3) in failing to rule that Mrs. Browning waived her claims and those that her family could raise on her behalf.

* * * * *

STANDARD OF REVIEW

Appellate courts generally review motions for summary judgment *de novo*, under the same criteria governing the trial court's consideration of the appropriateness of summary judgment.[1] Therefore, we must conduct a *de novo* review of the record to determine if its denial of summary judgment was proper.

SUMMARY JUDGMENT

A summary judgment is appropriate only "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to material fact, and that mover is entitled to judgment as a matter of law."[2]

Louisiana Code of Civil Procedure Article 966 provides the standard for considering motions for summary judgment. The 1996 amendments to that article and the post-amendment jurisprudence clearly suggest that summary judgment grants are now favored. Specifically, La.Code Civ.P. art. 966(C) provides:

> (1) After adequate discovery or after a case is set for trial, a motion which shows that there is no genuine issue as to material fact and that the mover is entitled to judgment as a matter of law shall be granted.
> (2) The burden of proof remains with the movant. However, if the movant will not bear the burden of proof at trial on the matter that is before the court on the motion for summary judgment, the movant's burden on the motion does not require him to negate all essential

---

[1]*Potter v. First Fed. Sav. & Loan Ass'n of Scotlandville*, 615 So.2d 318 (La.1993).

[2]La.Code Civ.P. art. 966(B); *Hayes v. Autin*, 96-287 (La.App. 3 Cir. 12/26/96), 685 So.2d 691, 694, *writ denied*, 97-281 (La. 3/14/97), 690 So.2d 41.

elements of the adverse party's claim, action, or defense, but rather to point out to the court that there is an absence of factual support for one or more elements essential to the adverse party's claim, action, or defense. Thereafter, if the adverse party fails to produce factual support sufficient to establish that he will be able to satisfy his evidentiary burden of proof at trial, there is no genuine issue of material fact.

In *Hayes v. Autin*,[3] this court determined that the burden to show that no material issues of fact exist remains with the movant, but this burden shifts to the adverse party once the movant has made a *prima facie* showing that the motion should be granted. However, "[i]f qualifying evidence is submitted in opposition to a motion for summary judgment which creates a dispute as to a genuine issue of material fact, the motion for summary judgment should be denied."[4]

**IMMUNITY**

Louisiana Revised Statutes 40:1233(A) provides:

> (1) Any *emergency medical person* certified pursuant to the provisions of this Subpart *who renders emergency medical care to an individual while* in the performance of his medical duties and *following the instructions of a physician* shall not be individually liable to such an individual for civil damages as a result of acts or omissions in rendering the emergency medical care, *except for acts or omissions* intentionally designed to harm, or *for grossly negligent acts or omissions which result in harm to such an individual.* Nothing herein shall relieve the driver of the emergency vehicle from liability arising from the operation or use of such vehicle.

> (2) The immunity granted to emergency medical personnel by the provisions of this Subpart shall extend to parish governing authorities, police departments, sheriffs' offices, fire department, or other public agencies engaged in rendering emergency medical services and its insurers with respect to such emergency medical services unless the emergency medical personnel employed by such agencies would be personally liable under the provisions of Paragraph (1) of this Subsection.

---

[3]*Hayes,* 685 So.2d 691.

[4]*Indep. Fire Ins. Co. v. Sunbeam Corp.*, 99-2181, 99-2257, p. 19 (La. 2/29/00), 755 So.2d 226, 237.

(Emphasis added.) Thus, our legislature gave emergency medical personnel immunity from liability only under certain circumstances. In order for the immunity to apply, the EMT must: (1) render emergency medical care to an individual while in the performance of his medical duties, <u>and</u> (2) he must be following the instructions of a physician.[5] Nevertheless, the immunity from liability does not apply, *inter alia*, to grossly negligent acts or omissions that result in harm to an individual.

WCCH believes it is entitled to immunity for their paramedics' actions, even though Chris and Brent admit that they had no direct contact with a physician while on the first ambulance run. Notwithstanding, WCCH asserts that Chris and Brent were acting under *indirect* medical direction, which is equivalent to following the instructions of a physician.

In *Ambrose v. New Orleans Police Department Ambulance Service*,[6] the fourth circuit found two EMTs to be following the instructions of a physician when they acted according to protocols or a prescribed set of instructions which physicians of the Orleans Parish Medical Society had established. Thus, the *Ambrose* court held that an EMT who followed established protocols while in the performance of his medical duties could only be liable for intentionally harmful or grossly negligent acts or omissions.[7] The court further held that the two EMTs involved were grossly negligent.[8]

In that case, our supreme court reversed, holding that the fourth circuit's finding of gross negligence was clearly wrong.[9] However, it obviously agreed with the fourth circuit's assertion that the plaintiffs must prove that the defendants were grossly negligent in order to recover in light of the limited immunity provided to these EMTs who were acting pursuant to protocols. On this issue, our supreme court stated:

---

[5]*Kyser v. Metro Ambulance, Inc.*, 33,600 (La.App. 2 Cir. 6/21/00), 764 So.2d 215, *writ denied*, 00-2212 (La. 10/27/00), 772 So.2d 650.

[6]627 So.2d 233 (La.App. 4 Cir. 1993).

[7]*Id.*

[8]*Id.*

[9]*Ambrose v. New Orleans Police Dep't Ambulance Serv.*, 93-3099 (La. 7/5/94), 639 So.2d 216.

6

> In order to prevail, plaintiffs must prove that the EMTs owed a duty to [the decedent], that the EMTs' acts or omissions caused his death or were the cause in fact of [his] loss of a chance of survival, and that the EMTs' acts or omissions were either intended to inflict harm or were grossly negligent. It is not enough for plaintiffs to prove simply that the EMTs acted negligently. Plaintiffs here must prove that defendants' actions or omissions were *grossly* negligent or *intentionally* designed to harm. The law, as required by the above quoted statute, thus accords emergency medical personnel a limited immunity from civil damages.[10]

No one claims that Chris and Brent's actions were intentionally designed to harm Mrs. Browning; thus, we will focus on the remainder of the standard.

Chris and Brent were rendering emergency medical care to Mrs. Browning while performing their medical duties. However, before they are granted the limited immunity La.R.S. 40:1233 provides, WCCH must prove that they actually followed the instructions of a physician given to them indirectly through WCCH's standing protocols.

During his deposition, Brent stated that the EMTs are "supposed to pass on everything" to a doctor. He explained:

> You have . . . direct and indirect medical direction. Direct would be direct communication [via] radio and phone. Your indirect is your standard order or procedure, protocols. Your guidelines on how you usually practice.
>
> . . . .
>
> . . . You work under either your indirect or your direct medical direction.

WCCH argues that Chris and Brent were following the instructions of a physician on the first ambulance run because they were following established protocols before and after Mrs. Browning refused transport to a hospital. Brent acknowledged that WCCH's requires its EMTs to learn and know these protocols. However, the Brownings have produced solid evidence to support their claim that Chris and Brent did not follow the hospital's protocols for obtaining and documenting a patient's written refusal on the first ambulance run.

Specifically, WCCH requires their paramedics to complete an "Acknowledgment of Patient's Refusal of Care" form in order "[t]o provide

---

[10]*Id.* at 219.

7

documentation of a patient's refusal of care for themselves or a member of their family." According to WCCH's protocols for executing this form, the paramedics must "[r]emember that this form is a *legal document* and should be completed *in its entirety*. This document should be completed and then read to the patient and then signed by the patient." (Emphasis added.) The form states:

> I admit that the above refusal is against the advice of the personnel of West Calcasieu Cameron Hospital Ambulance Service *who have advised me of the dangers which may result from my refusal* including, and not limited to the following: _____ _____ _____ _____.

> I realize that my refusal may cause or increase danger to myself or the patient. Nevertheless, I assume the risk and accept the consequences of my refusal.

> Furthermore, I do forever release and give up any claim, demand or action against West Calcasieu Cameron Hospital Ambulance Service, and any and all persons employed by or responding with any fire unit, rescue squad, police or ambulance unit, and do hereby covenant and agree to hold such persons and entities harmless from any claim, demand, loss or action, by myself, the patient, or any person claiming by or through myself or the patient for any alleged act or omission in the care or treatment of the patient in compliance with the refusal. This release is binding on my heirs, executors, and assigns.

(Emphasis added.)

In the blank, Brent filled in: "Advised to suck on ice chips, take a tepid water bath to cool down and relax." Under this, Chris later wrote: "Possible heat related disorder versus syncope of unknown etiology versus possible cardiac problem." According to Brent, Chris filled this information in after Mrs. Browning signed it. Conversely, Chris maintains that he included this notation before they asked her to sign the refusal form.

Brent admitted that he did not read the refusal form "word for word" to Mrs. Browning before she signed it, but he did remember advising her of what was stated in the form. Specifically, he testified: "I advised her that this was a release from medical responsibility. She had already been advised of the possibilities of what we were looking at. . . . [T]o me it presented as a heat related injury." Therefore, regardless of when Chris filled in the disputed language on the refusal form, Brent

made it clear that he did not remember advising her of the fact that she may have a heart related condition.

When Brent was asked if he told Mrs. Browning her condition could be life threatening, he responded: "I don't recall telling her that." This is consistent with the testimony of Patricia who believes the paramedics should have told her mother that she was "possibly having heart problems." Mr. Browning also remembered the paramedics telling his wife "that it was heat related." In fact, Chris is the only person on the scene who recalls any type of discussion that could have suggested to Mrs. Browning or her family that she might have something other than a heat related disorder. Chris alleges that he told her she may have a heart condition and that it could be life threatening, but no one else, including Brent, substantiates this.

WCCH's protocol also states that their employees are to "list a *detailed list* of possible injuries, illness, and outcomes of refusal of care or transport." (Emphasis added.) Thus, if Brent's memory is correct, the refusal form Mrs. Browning signed contained no warning, whatsoever, since he simply "advised [her] to suck on ice chips" and to "[t]ake a tepid water bath to cool down and relax." Even after Chris added the disputed language to the refusal form, it still lacked any advice concerning *specific* possible dangers or "outcomes of [her] refusal of care or transport."

The established protocol further states that the people who witness the completion of the form "should be someone other than ambulance personnel." Chris and Brent were the only people who signed as witnesses to the form. This is obviously a clear violation of WCCH's written guidelines, given that they could have easily asked others on the scene to witness the completion of the form.

WCCH also required Chris and Brent to use all their efforts to "convince" Mrs. Browning that she needed to seek medical treatment and/or transport. WCCH's rules state: "All effort to convince the patient to seek medical treatment and/or transport should be exhausted before the refusal form is attempted." However, when Brent was asked if he tried to convince her to go to a hospital, he answered:

> It is not my job to convince you. All I'm there . . . to do is to inform you of the possible injury or medical condition that you have. And if you are coherent enough and you can make your decision . . . it's your decision whether you consent to . . . [being] treated and transported.

9

Mr. Browning was asked whether the paramedics recommended to his wife that she go to the hospital. He answered: "They didn't recommend it. They just asked her if she wanted to go." When his daughter, Patricia, was asked if the paramedics tried to convince her mother to go to a hospital, she said: "No."

Given the foregoing factual disputes, it would be improper for this court to decide whether these EMT's adhered to WCCH's protocols. Therefore, it is up to the trier of fact to resolve this issue at a trial on the merits.

## BURDEN OF PROVING A MEDICAL MALPRACTICE CLAIM

The claimant has the burden of proving the validity of their medical malpractice claim. Louisiana Revised Statutes 9:2794(A) provides:

[T]he plaintiff shall have the burden of proving:

(1) The degree of knowledge or skill possessed or the degree of care ordinarily exercised by physicians, dentists, or chiropractic physicians licensed to practice in the state of Louisiana and actively practicing in a similar community or locale and under similar circumstances; and where the defendant practices in a particular specialty and where the alleged acts of medical negligence raise issues peculiar to the particular medical specialty involved, then the plaintiff has the burden of proving the degree of care ordinarily practiced by physicians, dentists, or chiropractic physicians within the involved medical specialty.

(2) That the defendant either lacked this degree of knowledge or skill or failed to use reasonable care and diligence, along with his best judgment in the application of that skill.

(3) That as a proximate result of this lack of knowledge or skill or the failure to exercise this degree of care the plaintiff suffered injuries that would not otherwise have been incurred.

Thus, according to La.R.S. 9:2794(A), any medical malpractice claimant must establish, by a preponderance of the evidence: (1) the defendant's standard of care; (2) the defendant's breach of that standard of care; and (3) a causal connection between the breach and the claimant's injuries.[11]

_____

[11]*Pfiffner v. Correa*, 94-924, 94-963, 94-992 (La. 10/17/94), 643 So.2d 1228.

**EXPERT TESTIMONY**

WCCH submits that the Brownings must produce expert evidence to prove their medical malpractice claim. Accordingly, WCCH believes the trial court should have granted it a summary judgment given the Brownings' failure to present expert testimony regarding: (1) WCCH's standard of care; (2) the hospital's violation of that standard of care; and (3) the causal connection between its alleged negligence and the Plaintiff's injuries.

*Expert Testimony on the Standard of Care and Breach of That Standard*

Louisiana Revised Statutes 9:2794(B) gives any party to a suit the right to subpoena any physician, without his or her consent, for a deposition or testimony at trial to establish a health care provider's standard of care. However, the statute is silent on the necessity of experts.

In *Pfiffner v. Correa*,[12] our supreme court pointed out that while a majority of Louisiana courts have held that expert testimony is necessary, others have held that it is not absolutely required. The latter merely state that the standard of care and a breach of that standard are "*best* determined from the testimony of other experts in the field."[13] Therefore, such testimony is persuasive, but not always needed.[14]

The jurisprudence has recognized various situations that do not necessitate medical malpractice plaintiffs to proffer expert evidence.[15] The *Pfiffner* court listed a few examples:

> Expert testimony is not required where the physician does an obviously careless act, such as fracturing a leg during examination, amputating the wrong arm, dropping a knife, scalpel, or acid on a patient, or leaving a sponge in a patient's body, from which a lay person can infer negligence. Failure to attend a patient when the circumstances demonstrate the serious consequences of this failure, and failure of an on-call physician to respond to an emergency when he knows or should know that his presence is necessary are also *examples of obvious negligence which*

---

[12]*Id.*

[13]*Id.* at 1233 (quoting *Broadway v. St. Paul Ins. Co.*, 582 So.2d 1368, 1373 (La.App. 2 Cir. 1991)).

[14]*Id.*

[15]*Id.*

11

*require no expert testimony* to demonstrate the physician's fault. Likewise, where the defendant/physician testifies as to the standard of care and his breach thereof, or *the alleged negligence consists of violating a statute and/or the hospital's bylaws*, (violation of LSA-R.S. 40:2113.4 which imposes a duty on a hospital to make emergency services available to all persons in the community without regard to income or insurance protection and *hospital bylaws establishing duties for on-call physicians*), expert testimony is also unnecessary to establish a malpractice claim.[16]

(Emphasis added.) Thus, the trier of fact does not need expert testimony to establish a defendant's standard of care nor does it need expert testimony to determine whether the defendant breached that standard when the medical and factual issues are such that the trier of fact could perceive negligence in the charged defendant's conduct as well as any expert could, or when objective evidence, including the defendant's testimony, demonstrates a breach of the standard.[17] However, if the matter does not involve an instance of obvious negligence, the plaintiff must establish the standard of care and its breach through the testimony of an expert witness.[18]

WCCH's protocols give their EMTs certain guidelines to follow when procuring a patient's refusal. These protocols clearly provide the applicable standard of care WCCH expected Chris and Brent to use on the first ambulance run. Therefore, under the circumstances, the Brownings did not need to proffer expert evidence on that issue.

In *Landry v. Clement*,[19] this court held that a hospital's negligence could be inferred when the claimants establish that the hospital's employees clearly violated the hospital's written rules, regulations, bylaws, or policies.

The objective evidence and testimony of the witnesses support the Brownings' contention that Chris and Brent failed to adhere to the hospital's protocols on obtaining and documenting a patient's refusal. Furthermore, if proven, the EMTs' failure to observe WCCH's established protocols is evidence of their obvious

---

[16]*Id.* at 1233-34 (citations omitted).

[17]*Id.*

[18]*Thomas v. Southwest La. Hosp. Ass'n*, 02-645 (La.App. 3 Cir. 12/11/02), 833 So.2d 548, *writ denied*, 03-476 (La. 4/25/03), 842 So.2d 401.

[19]97-852 (La.App. 3 Cir. 4/15/98), 711 So.2d 829, *writs denied*, 98-1281, 98-1331 (La. 6/26/98), 719 So.2d 1061, 719 So.2d 1288.

negligence. Consequently, the trier of fact does not need an expert's assistance to understand that this alleged failure constitutes negligence.

Therefore, we find that the Brownings, even without the submission of expert testimony, presented sufficient evidence to establish that they could satisfy their evidentiary burden of proving WCCH, through its EMTs, breached its standard of care at a trial on the merits.

*Expert Testimony on Causation*

The Plaintiffs must demonstrate by a preponderance of the evidence that a causal nexus exists between WCCH's fault and Mrs. Browning's death. The *Pfiffner* court noted that there are "cases in which there are obvious unnecessary delays in treatment which constitute medical malpractice and where causation is evident."[20] Furthermore, our supreme court recognized that the factfinder does not always need expert testimony to prove that a patient's death is causally connected to an unreasonable delay in diagnosis and treatment of that patient.[21]

Moreover, in *Estate of Adams v. Home Health Care of Louisiana*,[22] the supreme court recently set aside an appellate court's ruling granting a healthcare provider summary judgment when the plaintiff did not provide expert testimony to prove the defendant's negligence (failing to call the attending doctor when the condition worsened) caused the damages (amputation). Our supreme court found such evidence to be unnecessary and, thus, explained:

> *Causation is an issue of fact that is generally decided at the trial on the merits.* As the dissenting judge on the intermediate court noted, the admitted negligence clearly caused some damages, even if it merely hastened the amputation by one day. Plaintiff's damages for pain and suffering during the period of negligence, for aggravation of her medical condition, and for loss of any chance of saving her foot or of delaying the amputation is more appropriately decided by trial on the merits, *even if plaintiff's case regarding the amount of damages is considerably weakened by the dearth of expert testimony.*[23]

---

[20]643 So.2d at 1234.

[21]*Id.*

[22]00-2494 (La. 12/15/00), 775 So.2d 1064.

[23]*Id.* at 1064-65.

(Emphasis added.)

Chris admitted that Mrs. Browning's refusal to go to the hospital might have jeopardized or compromised her health. He also acknowledged that he believed her ventricular fibrillations occurred between the first and second ambulance run.

During his deposition, Brent was asked whether, in hindsight, he thought Mrs. Browning was having a heart attack or a forerunner to a heart attack when he examined her on the first ambulance run. He answered: "After looking at this and knowing what happened, she possibly could be." In addition, both paramedics recognized that if they had taken her to the hospital on that first run, she would have been placed on a cardiac monitor that could have detected the presence of any heart condition immediately. Moreover, while it is true that Brent denied this, Mr. Browning remembers Brent telling him: "Mr. Browning, we messed up. We should have transported your wife the first time and I'm really sorry."

Thus, whether Chris and Brent's failures, including their failure to adhere to WCCH's protocols and their alleged failure to inform Mrs. Browning of the possibility that she may have a heart condition, bear a causal connection to her eventual death is an inappropriate question at the summary judgment stage.[24]

We find the Brownings' failure to proffer expert evidence to prove causation unimportant at this stage in the proceedings, even though, ultimately, its absence may weaken their case, since the delay in diagnosing and treating Mrs. Browning's heart condition was surely a factor in bringing about her eventual demise. Clearly, she would have received immediate emergency medical care for her heart condition much sooner if she had agreed to transport.[25]

Thus, we find that the Brownings did not need to present expert testimony to prove the existence of a causal connection between WCCH's alleged negligence and Mrs. Browning's death.

**WAIVER**

---

[24]*See Id. See* also *Parker v. Harper*, 01-548 (La.App. 3 Cir. 10/31/01), 803 So.2d 76.

[25]*See Estate of Adams,* 775 So.2d 1064.

WCCH alleges that Mrs. Browning waived her claims and any claims brought on her behalf against the hospital by signing the refusal form presented to her by the paramedics on the first ambulance run.

Louisiana Civil Code Article 2046 provides a general rule of construction that "[w]hen the words of a contract are clear and explicit and lead to no absurd consequences, no further interpretation may be made in search of the parties' intent." As a general rule, the intent of the parties is determined from the four corners of the written instrument, and a court will ordinarily find extrinsic evidence inadmissible either to explain or to contradict the terms of the instrument.[26]

However, extrinsic evidence can be considered to determine what differences the parties intended to settle when disputes over the scope of a compromise agreement arise.[27] Moreover, the courts have recognized exceptions to this rule's application when substantiative evidence is presented establishing either: (1) the releasor was mistaken as to what she was signing, even though fraud was not present; or (2) the releasor did not fully understand the nature of the rights she released or did not intend to release certain aspects of her claim.[28]

Further, La.Civ. Code art. 3073 explains that a compromise agreement regulates, only, those differences the parties clearly comprehend, unless the differences are the necessary consequence of what is expressed in the agreement. It further mandates that a compromise agreement cannot be extended to those differences the parties never intended to be included in the agreement. In *Brown ex rel. Brown v. Drillers, Inc.*, our supreme court noted:

> In applying the rule of construction set forth in LSA-C.C. Art. 3073, courts are guided by the general principle "that the contract must be construed as a whole and *in light of attending events and circumstances*." Thus, the intent which the words of the compromise instrument express in light of the surrounding circumstances at the time of execution of the agreement is controlling.[[29]]

---

[26]*Brown ex rel. Brown v. Drillers, Inc.*, 93-1019 (La. 1/14/94), 630 So.2d 741.

[27]*Ortego v. Dep't of Transp. & Dev.*, 96-1322 (La. 2/25/97), 689 So.2d 1358.

[28]*Wiley v. Rapides Reg'l Med. Ctr.*, 02-1439 (La.App. 3 Cir. 6/12/03), 847 So.2d 752.

[29]630 So.2d at 748 (citation omitted); *Ryland v. St. Mary's Residential Training School,* 03-27 (La.App. 3 Cir. 4/30/03), 843 So.2d 1237.

(Emphasis added.)

The refusal form, itself, reveals crucial omissions which are at the heart of informed consent, and, thus, on its face, vitiates the same; namely:

> I admit that the above refusal is against the advice of the personnel of West Calcasieu Cameron Hospital Ambulance Service *who have advised me of the dangers which may result from my refusal* including, and not limited to the following:
>
> _____
> _____
> _____

(Emphasis added.) Chris and Brent never included on Mrs. Browning's refusal form the specific possible dangers or possible outcomes that might result from her refusal of care or refusal of transport, thus, her signature on this refusal form does not evidence her waiver of claims against WCCH.

Furthermore, WCCH adopted strict rules for their EMTs to follow when attempting to obtain a patient's refusal. The evidence and testimony presented suggest that Chris and Brent failed to adhere to all of them. In addition, we documented a few of the many factual issues that are still in dispute regarding the procedures they used to procure Mrs. Browning's signature on the refusal form. As such, the trier of fact must first attempt to resolve some of these issues and, only after this is done, can there be an enlightened ruling on whether Mrs. Browning, *in light of attending events and circumstances*, could have clearly comprehended the nature of the rights she released.[30]

Thus, we find that this issue is not conducive to summary judgment.

---

[30]*See Brown ex rel. Brown*, 630 So.2d 741.

## CONCLUSION

Considering the many factual disputes, the trial court correctly denied the Defendant's motion for summary judgment. We decline the writ and assess all costs to the Defendant-Applicant.

**WRIT DENIED.**