711 So.2d 829 (1998)
Bryin and Patricia LANDRY, Plaintiffs-Appellees,
v.
Dr. Richard J. CLEMENT and Southwest Louisiana Hospital Association, d/b/a Lake Charles Memorial Hospital, Defendants-Appellants.
No. 97-852.
Court of Appeal of Louisiana, Third Circuit.
April 15, 1998.
*830 Steven Broussard, Lake Charles, for Bryin and Patricia Landry.
John E. Bergstedt, Lake Charles, for Dr. Richard J. Clement, et al.
John Stanton Bradford, Benjamin Joseph Guilbeau, Lake Charles, for Lake Charles Memorial Hospital.
Before DOUCET, C.J., and YELVERTON and SAUNDERS, JJ.
SAUNDERS, Judge.
After giving birth to a stillborn baby boy, Patricia Landry and her husband, Bryin Landry, brought this medical malpractice action against her treating physician, Dr. Richard J. Clement, and against Lake Charles Memorial Hospital. The plaintiffs alleged negligence on the part of Dr. Clement and the nurses employed by the hospital who cared for Mrs. Landry in the hours preceding delivery. After a jury trial, verdict was rendered in favor of plaintiffs, finding defendants negligent and assessing Dr. Clement with eighty percent of the fault and Lake Charles Memorial Hospital (hereafter LCMH) with twenty percent of the fault. Judgment in accordance with this verdict followed.

FACTS
Mrs. Landry had last been in Dr. Clement's office on October 28, 1993, following a phone call in which she complained of heavy vaginal bleeding and abdominal cramping. She was seen immediately but no vaginal bleeding was noted on that examination. She was cautioned and instructed to return if the problem reappeared, or to go to the hospital if she felt she was in labor because of the fact that she was at term.
The following material facts took place on October 31, 1993, and November 1, 1994, which can be broken down into the following periods: two four-hour OB watches on October *831 31, 1993, and the final labor and delivery admission on the morning of November 1.

OB Watch 1
Sixteen year old Patricia Landry arrived at LCMH at approximately 8:15 a.m. on October 31, 1993, complaining of contractions.[1] She was attended to by Lori Guillory, R.N., who informed Dr. Clement that Mrs. Landry, his patient since April 29, 1993, was complaining of contractions every five minutes. Mrs. Landry was put on an external fetal monitor, and the fetal heart rate was documented at 150.[2]
Dr. Clement instructed Nurse Guillory to keep his patient under observation for four hours, to run a blood test and a urine test, and to start an IV giving fifty milligrams of Demoral and fifty milligrams of Vistaril to alleviate Ms. Landry's discomforts.
With no increases in the rate of her contractions and no other apparent progression of labor, Mrs. Landry was discharged from the labor and delivery unit at approximately 11:00 a.m. on October 31, 1993.

OB Watch 2
A few hours later the same day, at approximately 2:30 p.m., Mrs. Landry returned to LCMH, again complaining of contractions. She was again placed on a four hour OB watch. This time an external fetal monitor showed the baby's heart rate to be between 150 and 160. At 3:00 p.m., an IV was started, and again the patient was given Demoral and Vistaril for pain.
By 4:00 p.m., the fetal heart rate fell slightly to the 140-150 range, and the patient was contracting every two to five minutes, for forty seconds duration. Eventually, the fetal heart rate decreased into the 90's, but returned to the 120's after oxygen was administered. According to contemporaneous hospital records, Dr. Clement called in for a report at 4:30 p.m. and gave orders to the effect that if the patient's condition did not change by 6:30 p.m., she should be discharged with instructions to see him in his office the following day. In seeming accordance with these orders, the patient was examined by Nurse Lori Guillory at 6:20 p.m. and discharged from the hospital.
During this second OB watch, testimony is disputed between Dr. Clement and the nursing staff regarding exactly what took place.
The electronic fetal heart monitor strip evidences two or more decelerations or drops in the fetal heart rate during OB watch number 2, with some question as to precisely when at least one occurred.
The record contains conflicting evidence on the question of whether Dr. Clement was explicitly informed of the decelerations. Nurse Guillory, the attending nurse between OB watches one and two, testified that she informed Dr. Clement over the telephone of both of the decelerations. While it is not disputed that Dr. Clement made a phone call to the hospital at 4:30 p.m. and spoke with Nurse Guillory, Dr. Clement denies being informed of the decelerations.
According to the fetal monitor strip clock, the second deceleration occurred at 5:30 p.m. However, Nurse Guillory testified that the clock was inaccurate, and that the actual time was 4:30 p.m., moments before Dr. Clement's telephone call. Further confusion is caused by an entry made by the attending OB tech, which indicates a deceleration approximately nine or ten minutes after the phone conversation with Dr. Clement. Despite these inconsistencies, Nurse Guillory adamantly testified that she informed Dr. Clement of both decelerations in the 4:30 p.m. phone conversation, and that she discharged Mrs. Landry pursuant to Dr. Clement's instructions over the phone. After the 4:30 p.m. phone conversation, there is no evidence of any contact between Dr. Clement and the nursing staff regarding Mrs. Landry's status.

Final Labor and Delivery Admission
Mrs. Landry returned to the hospital at approximately 11:00 p.m. on the night of October 31, 1993, the same date of OB watches one and two. The patient was placed on an external monitor and the fetal *832 heart rate was shown to be between 130 and 140. An IV was started at 12:35 a.m. on November 1, 1993, and Demoral and Vistaril were given for pain. At 2:00 a.m., Pitocin was started as per Dr. Clement's protocol. At 1:15 a.m., a late note was added by the attending nurse at that time, Janine Henning, R.N., that the fetal heart tones had dropped to the 90's and the patient was turned to her right side, oxygen was applied and fetal heart tones recovered to 130. The nursing notes reflect that fetal heart tones remained between 130 and 150 until 7:00 a.m. The patient had received further doses of Demoral and Vistaril for pain at 2:30 a.m. and 4:30 a.m.
Dr. Clement arrived at the hospital and evaluated Mrs. Landry at 6:00 a.m. on the morning of November 1, 1993. Dr. Clement claims that he had been given no information during the course of the night of any problems or difficulties with the progress of labor up to that point, or of any compromise of the condition of the fetus or the mother. Dr. Clement ruptured the plaintiff's membranes and found that meconium staining was present, which is a possible sign of fetal distress. A call was placed for an epidural anesthetic preparatory to normal delivery. Dr. Clement then left the hospital and returned to his office.
The labor and delivery nursing assessments note that meconium staining was present. There is no evidence reflecting that Dr. Clement had been informed of the reduced fetal heart rates during the night. However, the hospital points out that, upon his arrival, Dr. Clement had access to all nurses' notes and fetal monitoring strips.
An epidural was inserted at 6:50 a.m., and Mrs. Landry was placed on an external fetal monitor. At that time, the fetal heart rate was noted to be in the 70's. Oxygen was administered and an internal electrode was inserted by Margaret Kramer, R.N. At that time, Dr. Clement was immediately notified of the problems and preparations were commenced for an emergency Caesarean section. Dr. Clement performed a low transfer section and delivered Ms. Landry's nine pound nine ounce stillborn fetus at approximately 7:28 a.m.
Mrs. Landry and her husband subsequently filed suit, alleging negligence on the part of LCMH and Dr. Richard Clement. Plaintiffs alleged that both Dr. Clement and LCMH committed various acts of negligence which resulted in the stillbirth of their child. Following trial, the jury returned a verdict in favor of the Landrys, awarding them damages, and assessing fault eighty percent to Dr. Clement and twenty percent to the hospital.
The jury awarded Patricia Landry $300,000.00 and Bryin Landry $150,000.00 in general damages for the wrongful death of their stillborn baby boy.[3] The Landrys were further awarded $150,000.00 for the conscious pain and suffering of the stillborn fetus. Finding that the $600,000.00 gross award exceeded the permissible amount recoverable in a medical malpractice action, the trial judge reduced the jury award to $500,000.
Both Dr. Clement and LCMH appeal the jury's verdict and allege several assignments of error. Both maintain that the trial court erred in allowing the jury to consider and subsequently award damages to the stillborn Landry fetus for conscious pain and suffering, particularly given their view that there was inadequate evidence to support the finding that the fetus had indeed suffered conscious pain and suffering. Defendants also complain of the wrongful death awards to Mrs. Landry of $300,000.00 and to Mr. Landry of $150,000.00. Both defendants further maintain that the trial court erred in refusing to allow evidence to be presented regarding Mrs. Landry subsequent pregnancies. Finally, both appellants allege error regarding their respective allocations of fault
In addition, Dr. Clement alone alleges that the jury erred in finding that he had breached the appropriate standard of care, or that such breach was the legal cause of the fetus's demise. Finally, LCMH alone alleges error *833 regarding certain jury instructions as well as a reference made by the judge to the national electronic fetal monitoring standard.
Responding by way of answer to appeal, the Landrys maintain that a multiple statutory cap should apply in this case, and as such, the $600,000.00 verdict should not have been reduced to $500,000.00 by the trial court, and that the jury's findings were not erroneous.

FINDINGS AND ALLOCATIONS OF FAULT
Both defendants allege that there was insufficient evidence to show that they had breached their respective standards of care owed to the Landrys.
For the following reasons, we find that the jury did not err in its findings and affirm its allocation of fault.

Doctor's Standard of Care
The standard of care owed to a patient by a physician is set forth in Cangelosi v. Our Lady of the Lake Medical Center, 564 So.2d 654, 661 (La.1989). "In a medical malpractice action against a physician, the plaintiff must establish the doctor's deviation from the standard of care exercised by others in the same field. The plaintiff must also show a causal relationship between the doctor's alleged negligence and the resulting injury. La.R.S. 9:2794(A); Smith v. State, 523 So.2d 815 (La.1988)."
The heart of plaintiffs' case against Dr. Clement is that had the physician taken it upon himself to be better apprised of his patient's pregnancy and its complications, he would have been aware of the vigilance which was required of him to save the fetus. We have reviewed the record, and there is sufficient evidence to support the jury's determination that Dr. Clement had access to Mrs. Landry's medical records, yet failed to avail himself of them, even after the meconium staining should have alerted him at 6 a.m. on November 1 of the possible complications in Mrs. Landry's case.
Dr. Robert Carpenter, Jr., the Landry's expert witness obstetrician, testified that under the circumstances of this case, Dr. Clement should have taken several steps which would have increased the chances of survival of the Landry fetus. Dr. Carpenter felt that upon noticing meconium staining, Dr. Clement should have taken Mrs. Landry off of Pitocin, which causes an increase in the frequency and intensity of contractions and can increase stress placed on the fetus. Dr. Carpenter also stated that Dr. Clement should have looked at the fetal heart monitor strips where he would have noticed the prior decelerations, and than he should have placed an internal electrode on the fetus. Additionally, Dr. Carpenter stated that Dr. Clement should not have ordered the epidural and should not have returned to his office after the 6 a.m. examination, but rather should have delivered the child. Furthermore, Dr. Carpenter opined that if the fetus had been delivered at 6 a.m. it would have survived.
In view of Dr. Carpenter's testimony, we are not in a position to say that the jury erred in concluding that Dr. Clement's actions fell below the applicable standard of care, or that the fetus's stillbirth was partly attributable to his negligence.
It is well established that a jury's findings of fact are entitled to great discretion, and in order to reverse a jury's factual determinations, we must satisfy the two part test set forth in Stobart v. State of Louisiana through Department of Transportation and Development, 92-C-1328 (La.4/12/93) 617 So.2d 880.
1) The appellate court must find from the record that a reasonable factual basis does not exist for the finding of the trial court, and
2) the appellate court must further determine that the record establishes that the finding is clearly wrong (manifestly erroneous).
Id. at 882.
The Stobart Court goes on to state:
"[R]easonable evaluations of credibility and reasonable inferences of fact should not be disturbed upon review where conflict exists in the testimony Rosell v. ESCO, 549 So.2d 840 (La.1989); Arceneaux v. Domingue, 365 So.2d 1330 (La.1978)." Id. Furthermore, "[t]he reviewing court must always keep in mind that `if the trial court or *834 jury's findings are reasonable in light of the record reviewed in its entirety, the court of appeal may not reverse, even if convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently.'" Id. at 882, 883; Housley v. Cerise, 579 So.2d 973 (La.1991).
Applying these standards to the facts before us, we find that the jury was not manifestly erroneous in concluding that Dr. Clement breached his standard of care owed to Mrs. Landry, regardless of whether it concluded that he knew of the decelerations of the fetal heart rate before his examination of Mrs. Landry at 6:00 a.m. on November 1, or whether it concluded that he should have known of them since he had access and could have viewed the fetal heart monitor strips and the nurses charts.[4]
Accordingly, we find no merit to Dr. Clement's contention on appeal that the trial court erred in entering an adverse judgment on the merits.

Hospital's Standard of Care
We likewise find no error in the trial court's judgment of liability with respect to LCMH.
The standard of care owed to a patient by a hospital is "to protect a patient from dangers that may result from the patient's physical and mental incapacities as well as from external circumstances peculiarly within the hospital's control." Galloway v. Baton Rouge General Hospital, 602 So.2d 1003,1008 (La.1992). Hunt v. Bogalusa Community Medical Center 303 So.2d 745, 747 (La.1974).
Whether a hospital has "breached the duty of care it owes to a particular patient depends upon the circumstances and facts of that case". Id.
The facts established at trial clearly show that several decelerations were not reported to Dr. Clement by the nurses on duty. Although the fetal heart monitor strips showed several decelerations during the night of Mrs. Landry's Labor and Delivery admit, the hospital does not dispute that Dr. Clement was not informed of them. Furthermore, while the head nurse of Labor and Delivery at LCMH testified that the nurses working in Labor and Delivery are required to complete a test in fetal heart monitoring after a training session, the evidence established that none of the attending nurses caring for Mrs. Landry, each of whom was licensed as R.N.'s less than three weeks before Mrs. Landry was admitted to the hospital, had ever received the training or taken the fetal heart monitoring test.
In light of the facts presented, we do not find that the allocations of fault on the part of the defendants were clearly wrong or an abuse of discretion. Both defendant-appellants contend that the jury erred in assessing Dr. Clement with 80% and LCMH with 20% of the fault. It is interesting to note that neither appellant alleges that negligence was altogether lacking. Instead, each attempts to justify their own actions by charging the other appellant with 100% of the fault.
Considering the above standards of care, the facts established at trial, and the vast discretion we are to afford the jury, we cannot say that the jury in the case before us was unreasonable in its allocation of fault among the appellants. As such, we find that appellants' assignments of error regarding allocation of fault and the standard of care owed lacks merit.

SURVIVAL ACTION
Both defendants allege that the trial court erred in allowing the jury to consider and subsequently award damages to the stillborn Landry fetus for conscious pain and suffering. The Landrys were awarded $150,000 in damages under La.Civ.Code art. 2315.1, which states:
A. If a person who has been injured by an offense or quasi-offense dies, the right to recover all damages for injury to that person, his property or otherwise, caused by the offense or quasi-offense, shall survive *835 for a period of one year from the death of the deceased in favor of:
....
(2) The surviving father and mother of the deceased, or either of them if he left no spouse or child surviving; and....
The Louisiana Supreme Court recently addressed the issue of whether a survival action can be pursued in connection with the death of a stillborn fetus in the case of Wartelle v. Women's and Children's Hospital, Inc., 97-744 (La.5/9/97); 690 So.2d 856. The court concluded that such a cause of action does not exist and reversed this court's prior holding[5] to the contrary on the basis that an unborn child cannot be recognized as a legally recognized life form unless born alive, even when its right to an imminent life is nullified by the negligent actions of a fellow human being.
Upon the denial of the supreme court to grant a rehearing in Wartell, the Landrys filed in this court a motion for voluntary dismissal of the survival action claim, which was granted. Accordingly, the $150,000.00 awarded by the jury for the conscious pain and suffering of the Landry fetus is reversed.

WRONGFUL DEATH DAMAGES
Both appellants contend that the jury committed error in awarding Mrs. Landry the sum of $300,000.00 and Mr. Landry the sum of $150,000.00 without evidence to justify such awards. They contend that the testimony presented by the Landrys does not in any way justify the large awards granted by the jury. Appellants argue that the death of the fetus has not changed the Landrys' relationship with one another, and point out that neither have sought any sort of help in terms of counseling.
To further support their contention that the amounts awarded to the Landrys were grossly excessive, LCMH refers to a number of Fourth Circuit cases wherein that court was unwilling to award a parent in similar wrongful death actions more than $150,000. They allege that in these cases the fetus was born alive and the parents would have had more contact with the baby than with a stillborn.
We are not persuaded by appellants' arguments. The standard for appellate review of damage awards is well-settled and clearly set forth in Andrus v. State Farm Mutual Auto. Insurance Company, 95-C-0801 (La.3/22/96); 670 So.2d 1206, 1210.
In appellate review of general damage awards, the court must accord much discretion to the trial court judge or jury. Reck v. Stevens, 373 So.2d 498 (La.1979). The role of an appellate court in reviewing awards of general damages is not to decide what it considers to be an appropriate award, but rather to review the exercise of discretion by the trial court. Id. Only if the reviewing court determines that the trial court has abused its "much discretion" may it refer to prior awards in similar cases and then only to determine the highest or lowest point of an award within that discretion. Coco v. Winston Indus., Inc., 341 So.2d 332 (La.1976).
Our high court goes on to explain that:
Because discretion vested in the trial court is "great," and even vast, an appellate court should rarely disturb an award of general damages. Youn v. Maritime Overseas Corp., 623 So.2d 1257, 1261 (La. 1993). Reasonable persons frequently disagree about the measure of general damages in a particular case. It is only when the award is, in either direction, beyond that which a reasonable trier of fact could assess for the effects of the particular injury to the particular plaintiff under the particular circumstances that the appellate court should increase or reduce the award. Id.

Id. at 1210.
Reviewing the particular facts of the case before us, we conclude that a reasonable trier of fact could have assessed damages in the amounts awarded to the Landrys *836 for the effects of the particular injuries they suffered. The testimony elicited at trial established that the Landrys were both in their first marriage and the stillborn fetus was to be their first child. Furthermore, Mrs. Landry testified that she suffered a great deal of pain after her second OB watch, and that after the epidural, she was frightened and was not informed as to whether she was going to have a natural birth or a C-section. Mrs. Landry further testified that it was a painful experience to hold a lifeless baby in her arms after the C-section. Since she remained in the hospital for further treatment, she was unable to attend her baby's funeral and thus had to watch it on videotape. Further testimony established that early during the pregnancy, the Landrys began purchasing items in anticipation of their baby's upcoming birth. Mrs. Landry also testified that during the time she was pregnant, she could feel the baby reacting to her and her husband's voices. Mrs. Landry's upset over her initial losses did not abate with her discharge, as evidenced by her not returning to school for three months, fearful that she might be asked questions about her baby.
In light of this and other evidence presented to the jury regarding the Landrys' pain and suffering, we find that the jury, being the ultimate trier of fact, was not unreasonable in its awards to this family under these circumstances. Consequently, we need not engage in a comparison of prior awards in superficially similar cases.

EVIDENCE OF SUBSEQUENT PREGNANCIES
Both appellants argue that the trial court erred in refusing to allow evidence to be presented regarding Mrs. Landry's subsequent pregnancies. At trial, the defendants attempted to introduce evidence of three subsequent pregnancies, two of which resulted in miscarriages and one of which resulted in the birth of a healthy baby. The defendants felt that this evidence was relevant regarding the emotional distress suffered by the Landrys, specifically regarding Mrs. Landry's testimony that she became very upset when she went around other children. We find that it was within the judges discretion to omit such evidence.
Although this issue has seldom been addressed in our jurisprudence, we agree with our colleagues in the fourth circuit who found that "[a]ppellants argument that the birth of the.... two daughters helped mitigate the loss of the infant has little merit." McCann v. ABC Insurance Co., 93-CA-1789 (La.App. 4 Cir. 7/14/94); 640 So.2d 865, 875.
We do not feel that subsequent pregnancies and births should be considered as mitigating factors, unless offered to directly rebut prior testimony. The Landrys did not testify at trial that they were unable to conceive and have more children, and it would be highly prejudicial and unfair to the Landrys to focus the jury's attention on the subsequent pregnancies instead of on the loss at hand.
We find this assignment of error lacks merit.

ADDITIONAL ASSIGNMENTS OF ERROR ON BEHALF OF LCMH
LCMH contends that the trial judge erred in failing to include its requested jury charge regarding the relationship of the doctor and the hospital, and who between them has ultimate control of a patient's health care course.
We have reviewed the proposed jury charge and find that it contains language heavily stacked in favor of the defendant hospital. Although it is understood by this court that nurses generally follow the orders of the treating physician, this particular jury charge would have been highly prejudicial and it overlooks the fact that nurses must nevertheless follow the standard of care imposed upon them by Louisiana law. It was certainly within the trial judges discretion to exclude LCMH's proposed jury charge number four. This assignment of error lacks merit.
LCMH next contends that the trial judge erred in including a reference to the national electronic fetal monitoring standard in contravention of Louisiana law on the duty of a nurse. LCMH claims that this reference to a national standard held the hospital nurses *837 to a standard that does not exist in Louisiana, prejudicing the jury into awarding fault against the hospital.
The Landrys contend that the reference to the national electronic fetal monitoring standards was proper. Both LCMH and the Landrys cite case law in support of their respective positions.
Under the circumstances, we find it unnecessary to address the issue for, regardless of which standard is appropriate, there was sufficient evidence to establish negligence on the part of the LCMH nurses, as it is clear that Dr. Clement was not advised at all of some of the fetal decelerations and that certain personnel might have lacked the training necessary to comport with any legal standard.
In its final assignment of error, LCMH contends that the trial judge erred by including an instruction to the jury that negligence could be inferred when the hospital violates its own bylaws. We find this assignment of error also lacks merit. Undoubtedly, a primary purpose of written standards established by hospitals is to prevent negligent acts from occurring. The complained of jury charge reads as follows: "Negligence on the part of the hospital may be established through proof that the hospital violated its own written rules, regulations, bylaws or policies." This particular charge was not unnecessarily prejudicial, especially in light of the hospital policies which were violated. We certainly agree that negligence may be established when it is proven that improperly trained nurses are working for a hospital in a specialized department.

MULTIPLE CAPS
In their answer to this appeal, the Landrys originally requested this court to reinstate the jury verdict of $600,000.00, which was reduced by the trial court to $500,000.00 pursuant to La.R.S. 40:1299.42(B)(1).
However, since the Landrys have voluntarily dismissed the survival action on behalf of the fetus, the amended jury award totals $450,000 and as such, clearly falls within the $500,000.00 statutory cap. Accordingly, we need not address the issue of whether multiple caps should apply.

DECREE
In light of the foregoing, the judgment of the trial court is reversed in part and rendered, awarding damages totaling $450,000.00, plus interest, with defendants to bear the costs of this proceeding in accordance with their respective percentages of fault.
REVERSED IN PART AND RENDERED.
NOTES
[1] The imminent expectancy of Ms. Landry was not in doubt, as her expected delivery date of October 25, 1993, had been known for months.
[2] According to exhibits introduced at trial, the average fetal heart rate for the term infant is between 110 and 160 beats per minute (bpm).
[3] Patricia and Bryin Landry were awarded $100,000 and $50,000, respectively, in each of the following categories: 1) Past, present, and future mental anguish and suffering, 2) Loss of love and affection of their child, and 3) Loss of service and society of their child. Thus, the total award for wrongful death general damages is $450,000.
[4] In fact, Dr. Clement's own expert witness, Dr. Harvey Gabert, testified that he would have reviewed the fetal heart monitor strips after having noticed the meconium staining at the 6 a.m. examination.
[5] Wartelle v. Woman's and Children's Hospital, 95-736 (La.App. 3 Cir. 5/22/96); 676 So.2d 632, writ granted, 97-744 (La.5/9/97); 693 So.2d 779.