# STATE OF LOUISIANA
## COURT OF APPEAL, THIRD CIRCUIT

## 15-1083

MITCH BENSON

VERSUS

RAPIDES HEALTHCARE SYSTEM, L.L.C., ET AL.

**********

APPEAL FROM THE
THIRTEENTH JUDICIAL DISTRICT COURT
PARISH OF EVANGELINE, NO. 72300-A
HONORABLE GARY J. ORTEGO, DISTRICT JUDGE

**********

## ELIZABETH A. PICKETT
## JUDGE

**********

Court composed of Marc T. Amy, Elizabeth A. Pickett, and James T. Genovese, Judges.

**AFFIRMED IN PART AND REVERSED IN PART.**

William H. Parker, III
Allen & Gooch
A Law Corporation
Post Office Box 81129
Lafayette, LA 70598-1129
(337) 291-1000
COUNSEL FOR DEFENDANT/APPELLANT:
      Rapides Healthcare System, L.L.C.
      D/B/A Savoy Medical Center

**Bryan D. Scofield**
**Scofield & Rivera, LLC**
**Post Office Box 4422**
**Lafayette, LA 70502**
**(337) 235-5353**
**COUNSEL FOR PLAINTIFF/APPELLANT:**
    **Mitch Benson**

**PICKETT, Judge.**

The plaintiff and the defendant appeal the trial court judgment in this medical malpractice case. For the following reasons, we affirm the judgment in part and reverse the judgment in part.

## FACTS

On October 21, 2007, while trimming trees with the assistance of a neighbor, Mitch Benson began experiencing severe chest pain. Mr. Benson was transported to the emergency room (ER) at Savoy Medical Center[1] (Savoy) in Mamou. He arrived at 4:50 p.m.[2] and was treated by ER physician, Dr. Clifford Godley. Dr. Godley determined that Mr. Benson was experiencing an acute ST elevation myocardial infarction, a heart attack, and that his right coronary artery was 100% blocked. At 5:00 p.m., he consulted Dr. Charles Monier, an interventional cardiologist,[3] who advised Dr. Godley to immediately administer a thrombolytic agent which is used to dissolve blood clots. Dr. Monier also advised Dr. Godley that he would know within twenty to twenty-five minutes if the thrombolytic therapy dissolved the clot.

Dr. Monier was not employed by Savoy but was the director of its catheterization laboratory (cath lab) where diagnostic imaging equipment is used to visualize the arteries of the heart and treat any blockages or abnormality found. Dr. Monier testified that he informed Dr. Godley that Savoy's cath lab was not

---

[1] Rapides Healthcare System, LLC managed Savoy Medical Center at that time.

[2] In his medical records, military time was used to document the administration of treatment to Mr. Benson and other events that occurred. At trial, witnesses testified using standard time to reference when events occurred that evening. For ease of reading, we use standard time when referencing events documented in Mr. Benson's medical records.

[3] Interventional cardiologists are cardiologists who specialize in catheter-based treatment of structural heart disease.

open on Sundays; therefore, he had to be prepared to transfer Mr. Benson to a hospital that had a cath lab open that day if the thrombolytic agent did not dissolve the clot. Dr. Monier also testified that he recommended Dr. Godley contact the referral hospital before administering the thrombolytic agent because some doctors do not like to perform cath procedures after the use of a thrombolytic agent fails.

Dr. Godley administered thrombolytic therapy, but it failed to dissolve the clot. An attempt by Savoy employees to get the cath lab staff to the hospital to perform a cath procedure on Mr. Benson failed, and at 7:02 p.m., Savoy contacted Acadian Ambulance to transport Mr. Benson to the Heart Hospital of Lafayette. At 8:02 p.m., when the ambulance arrived at Savoy, Dr. Godley signed an order transferring Mr. Benson to the Heart Hospital. A cath procedure was performed on Mr. Benson at 10:31 p.m. that evening to clear the blockage in his heart.

Mr. Benson filed a medical review panel claim against Savoy, Dr. Godley, as an employee of Savoy, and Dr. Monier, asserting that their treatment of him was negligent and caused him to sustain greater heart damage than he would have had if he had been transferred to the Heart Hospital immediately after it was known the thrombolytic therapy failed. The medical review panel found in favor of each health care provider, and Mr. Benson filed suit against the three health care providers. During the course of the litigation, Dr. Godley was shown not to be employed by Savoy, but Mr. Benson never named him, individually, or his employer as a defendant. Mr. Benson settled his claims against Savoy for less than $100,000, and it was dismissed from the litigation. Mr. Benson reserved his right to proceed against the Louisiana Patients' Compensation Fund Oversight Board (PCF), as provided in the Louisiana Malpractice Act, La.R.S. 40:1299.41–1299.49,

[4]and asserted a claim against the PCF for damages in excess of $100,000 caused by Savoy's negligence.

A jury trial was held in May 2015. Dr. Godley passed away before the trial. Mr. Benson argued that only Savoy was liable to him because its employees delayed his transfer from Savoy to the Heart Hospital and that the delay resulted in increased damage to his heart. He presented evidence that Dr. Godley's treatment of him did not fall below the standard of care. The PCF argued that Dr. Godley committed medical malpractice in failing to transfer Mr. Benson within the time frame recommended by Dr. Monier and that only Dr. Godley had authority to transfer Mr. Benson; therefore, Savoy employees were not responsible for the delayed transfer of Mr. Benson.

During trial, neither Mr. Benson nor Savoy presented evidence to establish that Dr. Monier's treatment of Mr. Benson constituted negligence, and he filed a motion for directed verdict at the conclusion of Mr. Benson's presentation of evidence. Dr. Monier averred that no evidence established his treatment of Mr. Benson fell below the standard of care applicable to him; therefore, he was entitled to have the claims against him dismissed. The motion was not opposed, and the trial court granted the motion, dismissing Mr. Benson's claims against Dr. Monier.

At the conclusion of the trial, the jury returned a verdict in Mr. Benson's favor. It assigned Dr. Godley with 60% liability and Savoy 40% liability for Mr. Benson's claims and awarded Mr. Benson the following damages:

Past & future emotional and mental anguish         $62,500

Past & future physical pain and suffering          $31,250

---

[4] Effective June 2, 2015, the Louisiana Medical Malpractice Act was redesignated as La.R.S. 40:1231.1-1231.10.

3

| Past & future loss of enjoyment of life | $31,250 |
|---|---|
| Past & future scarring and disability | $31,250 |
| Loss of chance for better treatment | $31,250 |

Both Mr. Benson and Savoy filed motions for judgment notwithstanding the verdict. Mr. Benson urged that the evidence did not establish Dr. Godley's treatment of him was negligent because no expert evidence established the standard of care applicable to him and that his treatment fell below that standard of care. He also argued that three of the jury's five damage awards were too low. Savoy argued that no evidence established negligence on the part of any Savoy employee that rendered it liable to Mr. Benson. The trial court denied both motions, finding the evidence presented at trial provided a reasonable basis for all the jury's findings. The trial court also awarded Mr. Benson $175,000 in damages for loss of earning capacity although he had not requested such damages.

Both parties appealed the trial court's judgment.

## ASSIGNMENTS OF ERROR

Mr. Benson assigns three issues for review:

1. Did the jury err in allocating 60% of the fault against a non-party, Dr. Clifford Godley, without expert testimony?

2. Did the District Court err in failing to admit into evidence the Emergency Medical Treatment and Active Labor Act (EMTALA) Transfer Policy of Rapides Healthcare System, LLC d/b/a Savoy Medical Center attached to Rapides' Requests for Production of Documents, and in light of that legal error, is the applicable standard of review manifest error or *de novo*?

3. Did the jury abuse its discretion regarding its award for past and future emotional and mental anguish, past and future physical pain and suffering, and past and future scarring and disability?

Savoy assigns for review the following as errors it contends were committed in the trial court:

1. The jury committed error, either manifest or legal, in concluding that Savoy committed medical malpractice, in any percentage, and specifically in the amount of 40%.

2. The jury committed error, either manifest or legal, in concluding that Dr. Clifford Godley's fault herein was any less than 100%, and was specifically in error in limiting his percentage of fault to 60%.

3. The trial judge committed error, either manifest or legal, in granting the plaintiff's Motion for Judgment Notwithstanding the Verdict/Motion for New Trial, in the form of making an award to the plaintiff for "loss of earning capacity" in any amount, and specifically in the amount of $175,000.

## DISCUSSION

*Medical Malpractice*

Whether a health care provider's conduct falls below the applicable standard of care is a factual determination that is subject to the manifest error standard of review. *Martin v. E. Jefferson Gen. Hosp.*, 582 So.2d 1272 (La.1991). Appellate review of a jury's factual findings must be conducted in accordance with the long-held tenet that, if the "jury's findings are reasonable in light of the record reviewed in its entirety, the court of appeal may not reverse, even though convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently." *Sistler v. Liberty Mut. Ins. Co.*, 558 So.2d 1106, 1112 (La.1990).

When reviewing a jury's factual findings, "the evidence must be viewed in the light most favorable to the party who prevailed before the trier-of-fact;" we cannot substitute our own factual findings for those of the trier of fact. *Thibodeaux v. Jurgelsky*, 04–04, p. 29 (La. 3/11/05), 898 So.2d 299, 316. Accordingly, "[w]here there are two permissible views of the evidence, the factfinder's choice between them cannot be manifestly erroneous or clearly wrong." *Rosell v. ESCO*, 549 So.2d 840, 844 (La.1989). If, however, we find that the trial court's verdict

5

was clearly without evidentiary support, or clearly wrong based on the evidence, we must reverse the verdict. *Ambrose v. New Orleans Police Dep't Ambulance Serv.*, 93-3099, 93-3110, 93-3112 (La. 7/5/94), 639 So.2d 216.

Unless credible documents or objective evidence contradict a witness's story such that "a reasonable fact finder would not credit" his story, we cannot find manifest error or clear wrongness in a finding based on a credibility determination. *Rosell*, 549 So.2d at 845. If no such contradictory factors are present, and a fact finder's findings are based on credibility determinations of witnesses, "that finding can virtually never be manifestly erroneous or clearly wrong." *Id.*

To successfully establish a claim for medical malpractice, a plaintiff must prove the standard of care applicable to the health care providers sued, that the healthcare providers deviated from the applicable standard of care, and that their deviation caused injury to him. *See* La.R.S. 9:2794(A); *Johnson v. Morehouse Gen. Hosp.*, 10-387, 10-488 (La. 5/10/11), 63 So.3d 87. Hospitals have the "duty to protect a patient from dangers that may result from the patient's physical and mental incapacities as well as from external circumstances peculiarly within the hospital's control." *Hunt v. Bogalusa Cmty. Med. Ctr.*, 303 So.2d 745, 747 (La.1974). Whether a hospital has "breached the duty of care it owes to a particular patient depends upon the circumstances and facts of that case." *Id.*

As a general rule, expert testimony is required to establish the standard of care and a breach thereof. *Samaha v. Rau*, 07-1726 (La. 2/26/08), 977 So.2d 880. Cases where the health care provider's negligence is so obvious that a lay person can infer negligence without the guidance of expert testimony are exceptions to the general rule; expert testimony is not required in such situations. *Id.* Examples of obvious negligence that do not require expert testimony include amputating the

6

wrong limb, "dropping a knife, scalpel, or acid on a patient, leaving a sponge in a patient's body," or violating a statute and/or the hospital's bylaws. *Pfiffner v. Correa*, 94-924, 94-963, 94-992, p. 9 (La. 10/17/94), 643 So.2d 1228, 1233.

In his first assignment of error, Mr. Benson argues the evidence does not establish that Dr. Godley committed malpractice because no expert testimony establishes the standard of care applicable to Dr. Godley and that Dr. Godley breached that standard of care as required by La.R.S. 9:2794(A). He contends, therefore, that the jury's assessment of fault to him constitutes legal error. The PCF argues to the contrary that only Dr. Godley had the authority to transfer Mr. Benson from Savoy to the Heart Hospital and that he did not transfer Mr. Benson until 8:02 p.m.; consequently, he alone is liable for the delay in Mr. Benson's transfer.

In its first assignment of error, the PCF asserts that Mr. Benson failed to prove Savoy committed malpractice because he did not present expert evidence establishing the standard of care applicable to the registered nurse it contends initiated the attempt to have the cath procedure performed at Savoy and that the nurse's actions fell below the standard of care required of a registered nurse. Mr. Benson argues the Savoy employees' attempt to bring in the necessary staff to perform a cath procedure on him after the thrombolytic therapy failed caused an extended delay in his being transferred to the Heart Hospital and that the delay exacerbated the damage caused by his heart attack. He argues that Savoy administrators caused the delay because although he had been prepared for the cath procedure and persons qualified to perform the procedure were ready to proceed, the administrators would not allow the cath procedure to be performed.

7

*Liability of Dr. Godley*

Dr. Monier's testimony establishes that he advised Dr. Godley at 5:00 p.m. to immediately administer thrombolytic therapy to Mr. Benson, that he informed Dr. Godley he would know within twenty to twenty-five minutes whether the therapy worked, and that if the therapy did not work, Dr. Godley needed to transfer Mr. Benson immediately to a facility that could perform a cath procedure.

Dr. Godley ordered prescription medication for Mr. Benson between 4:55 p.m. and 6:05 p.m. At 5:50 p.m., he noted in his Emergency Physician Record: "Discussed [history], exam, results, [diagnosis] and plan with Dr. Ardoin[/]Monier." No order or notation was made regarding the transfer of Mr. Benson until 7:02 p.m. when Acadian Ambulance was called to transport him to the Heart Hospital. Dr. Godley signed an order transferring him to the Heart Hospital at 8:02 p.m. when Acadian Ambulance arrived at Savoy.

Mr. Benson supports his claim that Dr. Godley did nothing wrong with testimony by Dr. Monier that Dr. Godley did "everything [he was] allowed to do to properly treat" Mr. Benson. Dr. Monier also testified, however, that he was surprised to receive the phone call from Dr. Godley at 5:50 p.m. because he thought Mr. Benson would have been transferred by that time. Furthermore, when asked whether Dr. Godley contacted him at 5:00 p.m. to collaborate on whether to administer thrombolytic therapy, Dr. Monier responded:

> It shouldn't require a collaboration. I mean in my opinion[,] any ER physician that's worth his weight . . . should know how to treat patients. I mean they should. Now that being said, maybe the phone call is because we do have a cardiologist in the parish and hey, do we have a cath lab today[?]

Dr. Monier explained that the heart is a muscle, that the deprivation of oxygen to muscle damages the muscle, that the standard of care is to restore

8

oxygen to the muscle as quickly as possible, and that the longer muscle is deprived of oxygen, the likelihood of damage to the muscle increases. Dr. Kevin Courville, an interventional cardiologist who is Mr. Benson's treating physician, and Dr. Jon Leleux, an interventional cardiologist who testified on behalf of Savoy, agreed that the delay in transferring Mr. Benson, once it was known the thrombolytic therapy failed, was very important because the longer the flow of oxygen and nutrients to Mr. Benson's heart was blocked, the odds of damage to his heart increased. The experts further agreed that if thrombolytic therapy fails and a cath procedure cannot be performed, *the* standard of care is to immediately transfer a heart attack patient to a facility that can perform a cath procedure.

As argued by Mr. Benson, the PCF did not present the testimony of an expert in emergency room medicine regarding the standard of care applicable to emergency room physicians or that Dr. Godley's treatment of Mr. Benson fell below that standard of care. In *Smith v. Clement*, 01-87, p. 5 (La.App. 3 Cir. 10/3/01), 797 So.2d 151, 156, *writs denied*, 01-2878, 01-2982 (La.1/25/02), 807 So.2d 249, 843, respectively, this court held "a specialist in one field can give expert testimony regarding the standard of care applicable to those areas of practice that are common to both disciplines." In *Smith*, a pathologist's testimony was accepted to establish the standard of care applicable to the defendant, a gynecologist who performed a tubal ligation on a patient, and that the gynecologist's treatment fell below the standard of care. The pathologist testified that "special knowledge would not be required of a physician to understand the final diagnosis stated on the lab report, i.e., only one tube had been cut during the surgery" and that "a fourth-year medical school student would understand the

9

report." *Id*. at 156-57. *See also, Corley v. State, Dep't of Health & Hosp.*, 32,613 (La.App. 2 Cir.12/30/99), 749 So.2d 926.

We find the diagnosis and emergency treatment of acute heart attacks is an area of practice in which the disciplines of cardiology and emergency room medicine overlap to such a degree that Dr. Godley should have known and understood the importance of following Dr. Monier's treatment instructions *and* the potential damage that could result to Mr. Benson's heart if he did not follow those instructions. Accordingly, it was reasonable for the jury to accept that the testimony of Drs. Monier, Courville, and Lejeune established the standard of care applicable to Dr. Godley. Therefore, the jury's determination that Dr. Godley's treatment of Mr. Benson fell below that standard of care is supported by the evidence and is not manifestly erroneous.

### Liability of Savoy

Steve Manuel, the department head of Savoy's cath lab, was working as a nursing supervisor the day of Mr. Benson's heart attack; he did not provide care to Mr. Benson in the ER. Mr. Manuel testified that Dr. Brent Ardoin, Savoy's chief of staff, asked him to try and get the cath lab staff into the hospital to perform a cath procedure on Mr. Benson. He also testified that he called and asked Dr. Monier if he would come to Savoy to perform the cath procedure.

Mr. Manuel explained that three people are necessary to perform a cath procedure at Savoy: two Savoy employees, Mr. Manuel and Nancy Lafleur, a cath tech; and Dr. Monier. Ms. Lafleur was not at work that day, and Mr. Manuel's attempts to contact her were unsuccessful. When he could not contact Ms. Lafleur, Mr. Manuel contacted Chris Bordelon, a former Savoy employee who had worked in the same capacity as Ms. Lafleur, to request his assistance in performing the

cath procedure. Mr. Bordelon had left Savoy's employment on good terms a short time before over a pay dispute but had been talking to Mr. Manuel about returning to Savoy in his previous position in the cath lab. He was willing to assist in the cath procedure or to be re-hired that day if the hospital administration would approve either scenario.

Dr. Monier confirmed that Mr. Manuel asked him to perform a cath procedure on Mr. Benson, and he agreed. Dr. Monier testified that he informed Mr. Manuel the administration would have to approve Mr. Bordelon's participation in the cath procedure. Mr. Manuel testified that he made it clear to everyone involved that the administration had to authorize Mr. Bordelon to assist with the cath procedure. Mr. Bordelon confirmed Mr. Manuel made that clear to him.

After talking to Mr. Manuel, Dr. Monier rushed from his home in Ville Platte to Savoy, arriving at approximately 6:15 p.m. to 6:20 p.m. Ms. Lafleur was still not available. Mr. Bordelon was at the hospital, willing to assist in the procedure. In fact, he and Mr. Manuel had prepped the cath lab and Mr. Benson, and everything was ready for Dr. Monier to perform the cath procedure. The administration had not, however, approved Mr. Bordelon's participation in the procedure.

Dr. Monier conferred with Savoy administrators, but the request to perform the cath procedure was not approved because Mr. Bordelon was not a Savoy employee. He documented the denial at 6:46 p.m. Dr. Monier testified that due to Dr. Ardoin's and Mr. Manuel's positions at Savoy, he believed the cath procedure would be performed, even though Mr. Bordelon would have to assist in Ms. Lafleur's absence. When asked at trial who caused the delay, Dr. Monier stated, "between Steve and Dr. Ardoin, I was led to believe we would be doing a [cath]

11

procedure." Dr. Monier testified that he personally spoke with Dr. Ardoin and that Dr. Ardoin asked him to go in and perform the cath procedure. Dr. Monier also testified that because Dr. Ardoin had been in Mamou for a long time, he "thought by the time I got there they would've worked it out with administration. We'd be doing a procedure." According to Dr. Monier, Dr. Ardoin and Mr. Manuel, the cath procedure would be performed.

Dr. Ardoin did not testify at trial, but the testimonies of Mr. Manuel and Dr. Monier and Savoy's records established he was involved with Mr. Benson's treatment at Savoy. He is identified as a "CONSULT," along with Dr. Monier, for Mr. Benson. Furthermore, notes in the record establish his presence by Mr. Benson's bedside throughout the time Mr. Benson was at Savoy.

Mr. Benson argues the testimony of Drs. Monier, Courville, and Leleux establish the standard of care applicable to Savoy. That standard of care is: if thrombolytic therapy fails to dissolve a clot in a patient experiencing a heart attack and a cath procedure cannot be performed at the treating facility, the patient should be immediately transferred to a facility that can perform a cath procedure. With regard to Mr. Manuel, specifically, Dr. Monier testified that he "assume[d]" Mr. Manuel knew and understood that when the heart is deprived of oxygen, it sustains damage.

Counsel for Mr. Benson reviewed the following information contained in Savoy's informed consent for "T-PA infusion treatment [thrombolytic therapy] of myocardial infarction" with Dr. Courville:

> Our goal is to prevent and/or decrease loss of heart muscle during the heart attack and to decrease your risk of mortality. Time is of the essence.

12

This consent had to be completed on Mr. Benson's behalf for him to receive the thrombolytic therapy.

Drs. Monier, Courville, and Leleux treat patients in rural hospitals, like Savoy, around Lafayette. Dr. Courville testified that he is familiar with the applicable standards of care of hospitals in Evangeline and St. Landry Parish with regard to cardiology services. He agreed with Mr. Benson's counsel that one could infer from the above statements "that the Savoy . . . people knew or at least should have known that time is of the essence and you better hurry to . . . treat a heart attack like Mitch was having."

Dr. Courville further opined that the failure to call Acadian Ambulance until 7:02 p.m. was a prolonged delay in light of the fact it was known at 5:25 p.m. that the thrombolytic therapy failed. Dr. Courville also testified: "if the hospital invited the physician to come and do the procedure . . . and everybody shows up to do the procedure, and the hospital[] says, no, then I would think the blame would be to the hospital delaying it." He agreed that "if Savoy . . . couldn't do the cath procedure, waiting an hour and twelve minutes to an hour and thirty minutes to even call Acadian Ambulance does not meet the applicable standard of care."

Dr. Leleux testified it could take up to ninety minutes to know whether the thrombolytic therapy failed. Nonetheless, he agreed with Drs. Monier and Courville that if it was known at 5:25 p.m. the thrombolytic therapy failed, not calling Acadian Ambulance until 7:02 p.m. and Mr. Benson not being transported from Savoy until 8:02 p.m., was not within the standard of care because the cath procedure could not be performed at Savoy.

In *Hastings v. Baton Rouge General Hospital*, 498 So.2d 713 (La.1986), the supreme court held that when a health care provider's alleged negligence consists

of violating a statute and/or the hospital's bylaws is a circumstance in which expert testimony is not required to prove malpractice. *See also*, *Pfiffner*, 643 So.2d 1228. In *Landry v. Clement*, 97-852 (La.App. 3 Cir. 4/15/98), 711 So.2d 829, *writs denied*, 98-1281, 98-1331 (La. 6/26/98), this court held that negligence could be inferred to the defendant hospital because the hospital's nurses failed to report all fetal heart monitoring results to the patient's physician *and* the nurses attending the patient had not received training on performing fetal heart monitoring tests as required by hospital policy.

Similarly, in *Browning v. West Calcasieu Cameron Hospital*, 03-332 (La.App. 3 Cir. 11/12/03), 865 So.2d 795, *writ denied*, 03-3354 (La. 2/13/04), 867 So.2d 691, the defendant hospital had outlined certain guidelines its EMTs were required to follow when procuring a patient's refusal to be transported to the hospital after the patient called for an ambulance. The EMTs failed to follow those guidelines, and the patient died. Another panel of this court determined that the hospital's protocols provided the standard of care applicable to the hospital's EMTs; therefore, the plaintiffs were not required to present expert evidence on that issue.

After considering the above jurisprudence, we conclude Savoy's informed consent form sets forth the standard of care applicable to its treatment of heart patients receiving thrombolytic therapy. The form's stated goal of preventing and/or decreasing the loss of heart muscle and its specific recognition that "Time is of the essence" is an acknowledgement of the standard of care testified to by Drs. Monier, Courville, and Leleux. Accordingly, we conclude Mr. Benson was not required to present additional expert testimony to establish the standard of care applicable to Savoy.

Savoy further argues that only Dr. Godley had the authority to transfer Mr. Benson. Dr. Monier did testify that only Dr. Godley had the authority to transfer Mr. Benson, but Dr. Courville testified that Dr. Ardoin also had the authority to order that Mr. Benson be transferred because Dr. Godley consulted him regarding Mr. Benson's treatment. Furthermore, the uncontradicted evidence shows: (1) Dr. Ardoin initiated the attempt to have the cath procedure performed at Savoy, and (2) the attempt to obtain the required staff and the authorization of the administration to re-hire Mr. Bordelon or use a non-employee to assist in the procedure that evening contributed to the extended delay in Mr. Benson's transfer.

Although there is no evidence that Dr. Godley could not have transferred Mr. Benson before he issued his transfer order at 8:02 p.m., the evidence does not establish *when* Dr. Ardoin requested that Mr. Manuel attempt to get the cath lab staff to the hospital to perform the procedure. Accordingly, questions surround whether the delay of transferring Mr. Benson between 5:25 p.m. and 5:50 p.m., when it was known the thrombolytic therapy did not work, and thereafter was the result of Dr. Godley's failure to initiate the transfer or the result of Savoy's attempt to get a cath crew together and obtain administrative authority for Mr. Bordelon to assist with the cath procedure. For these reasons, it was reasonable for the jury to conclude that Savoy negligently contributed to the delay in transferring Mr. Benson to the Heart Hospital.

***Assessment of Fault***

Mr. Benson and the PCF assign error with the jury's assessment of fault to Dr. Godley and Savoy. The apportionment of fault is a factual determination which can only be disturbed if it is clearly wrong or manifestly erroneous. *Clement v. Frey*, 95-1119, 95-1163 (La. 1/16/96), 666 So.2d 607. The assessment

15

of fault is guided by the factors set forth in *Watson v. State Farm Fire & Casualty Insurance Co.*, 469 So.2d 967 (La.1985), where the supreme court outlined various factors that influence the percentage of fault assigned to the parties. Those factors include: (1) whether the conduct resulted from inadvertence or involved an awareness of the danger; (2) how great a risk was created by the conduct; (3) the significance of what was sought by the conduct; (4) the capacities of the actor, whether superior or inferior; and (5) any extenuating circumstances which might require the actor to proceed in haste without proper thought. *Id.*

The testimony at trial and Savoy's records show: (1) Dr. Godley was the only physician in direct contact with Dr. Monier regarding thrombolytic therapy for Mr. Benson; (2) he knew or should have known at 5:25 p.m. that the thrombolytic therapy failed; (3) he knew Savoy's cath lab was not open on Sundays; and (4) he did not transfer Mr. Benson immediately after knowing the thrombolytic therapy did not work.

The evidence also shows: (1) Dr. Ardoin, Savoy's chief of staff, initiated the attempt to get the cath lab staff in to perform a cath procedure on Mr. Benson; (2) one member of the cath lab staff could not be contacted; (3) Mr. Manuel contacted a non-employee to assist in the procedure if the missing staff member could not be reached; (5) Savoy's administration would not approve a non-employee's participation in the cath procedure; (6) the attempt to assemble the cath lab staff to perform the cath procedure contributed to the delay in transferring Mr. Benson to the Heart Hospital; and (7) at least one expert testified that Dr. Ardoin had the authority to transfer Mr. Benson.

Based on the evidence presented, the jury could have reasonably concluded: (1) because Dr. Godley had the first knowledge that the thrombolytic therapy did

16

not work, he had a superior ability to transfer Mr. Benson in a timely fashion; (2) Dr. Godley did not transfer Mr. Benson as quickly as he should have; (3) Dr. Ardoin could have transferred Mr. Benson when Dr. Godley did not; (4) Savoy's attempt to assemble the cath crew to perform the cath procedure contributed to the extended delay in Mr. Benson being transported to the Heart Hospital; and (5) Dr. Ardoin, as chief of staff, should have determined whether Mr. Bordelon's participation in the cath procedure would be authorized by Savoy's administration before Dr. Monier arrived at the hospital. For these reasons, we cannot say the jury committed manifest error in its assessment of fault, and we affirm the assessment of 60% fault to Dr. Godley and 40% fault to Savoy.

### *Excluded Evidence*

Mr. Benson next argues that the trial court erred in refusing to admit Savoy's Rapid Transfer Policy into evidence. He points out that Savoy produced a document entitled "EMTALA-Transfer Policy" in response to an interrogatory that stated: "Please identify any of your interhospital transfer strategies, guidelines and/or policies that were in effect on October 21, 2007[,] at the time Mitch Benson was being treated at Savoy Medical Center" and a request for production of documents that sought production of the "transfer strategies, guidelines and/or policies."

The PCF filed a motion in limine and objected to the admission of the document because it was dated May 2009, one and one-half years after Mr. Benson was treated at Savoy. Mr. Benson defended the introduction of the 2009 policy on two bases: (1) Savoy produced it without objection; and (2) it established Savoy did not have a rapid transfer policy in effect at the time of his heart attack.

EMTALA stands for "Emergency Medical Treatment and Active Labor Act." 42 U.S.C. § 1395dd. It applies only to hospitals. In *Spradlin v. Acadia-St. Landry Medical Foundation*, 98-1977, pp. 8 (La. 2/29/00), 758 So.2d 116, 121 (footnote omitted), the supreme court outlined the requirements established by EMTALA:

> Under EMTALA, any individual who appears in the emergency department of a covered hospital and requests examination or treatment must be provided an "appropriate medical screening examination." In the event the hospital determines that the individual has an "emergency medical condition," the hospital is additionally required to provide further examination and treatment as may be necessary to stabilize the condition or to arrange for an appropriate transfer to another medical facility.

The trial court refused to allow the policy to be admitted into evidence or to allow Dr. Courville to testify about the policy on the basis that Mr. Benson's attempt to use the 2009 policy to show that Savoy had no such policy in 2007 established that the 2009 policy constituted a subsequent remedial measure.

Louisiana Code of Evidence Article 407 prohibits the admission of evidence of subsequent remedial measures "to prove negligence or culpable conduct in connection with the event" at issue. The trial court noted other evidence, such as an admission or stipulation by Savoy, could be used to establish that Savoy did not have such a policy in place in 2007. Accordingly, the trial court properly refused the admission of Savoy's 2009 EMTALA –Transfer Policy into evidence.

*Damages*

In his last assignment of error, Mr. Benson assigns error with the jury's assessment of damages. He argues the jury's awards of $62,500 for past and future emotional and mental anguish and $31,250 each for past and future physical pain and suffering, and past and future scarring and disability are abusively lowF.

The jury's determination of the amount to award in damages is a finding of fact. *Rando v. Anco Insulations, Inc.*, 08-1163, 08-1169 (La. 5/22/09), 16 So.3d 1065. On appellate review, the initial inquiry regarding an award of damages is whether the award for the particular injuries and their effects upon the particular injured person is a clear abuse of the trier of fact's great discretion. *Id.* Only if a detailed analysis of the facts shows the award to be an abuse of discretion can the award be considered either excessive or insufficient. *Id.* We review the jury's exercise of discretion, not decide the damage award we believe would be appropriate. *Youn v. Maritime Overseas Corp.*, 623 So.2d 1257 (La.1993), *cert. denied*, 510 U.S. 1114, 114 S.Ct. 1059 (1994).

Mr. Benson presented the testimony of family and friends regarding the limitations he has suffered as a result of his October 21, 2007 heart attack. He also presented the testimony of Dr. Courville, who has been his treating physician since 2010, to establish the validity of those limitations and that they were more probably than not the result of additional damage caused by the delay in the cath procedure being performed at the Heart Hospital. Mr. Benson recites testimony highlighting the effects his heart attack has had on his life. He relies on Dr. Courville's testimony to show that the delay in treatment after the failed thrombolytic therapy caused all of the complaints and restrictions he now has.

Dr. Courville initially opined that more probably than not Mr. Benson's complaints of fatigue, shortness of breath, tiring easily, and other restrictions resulted from the delay between the onset of his heart attack and the insertion of the stent during the cath procedure at the Heart Hospital. Under cross-examination, Dr. Courville acknowledged, however, that it was reasonable to conclude that his complaints and restrictions were not all related to his October

19

2007 heart attack. Dr. Courville also agreed that Mr. Benson could be having symptoms during his treatment that are not related the heart attack. He further acknowledged that he could not know what symptoms Mr. Benson experienced between October 2007 and January 2010, when he became Mr. Benson's treating physician, are attributable to the October 2007 heart attack and the treatment therefore and what symptoms are attributable to a 95% occlusion of another heart artery that was diagnosed in January 2010.

Dr. Leleux testified that based on his review of Mr. Benson's records, he does not believe Mr. Benson has permanent heart damage. Specifically, he referenced test results from January 2010, February 2011, and February 2012 that he considered normal. He explained his conclusion and opined that Mr. Benson's heart was working properly. Furthermore, Dr. Leluex opined that Mr. Benson's tiredness, fatigue, and shortness of breath could be attributable to medications used to treat patients who have had heart attacks or have weakened heart muscles. He also observed that an echocardiogram evidenced increased pulmonic velocity which is suggestive of right ventricular pressure volume overload that is indicative of a problem with the lungs. Dr. Leleux explained that this condition can cause stretching of the blood vessel between the heart and lung causing some chest pain and fatigue. He further observed there is data evidencing that patients with heart attacks on the bottom of the heart like Mr. Benson's tend to do just as well if nothing additional is done, i.e., cath procedure, after thrombolytic therapy failed, but most doctors do not follow that methodolgy.

The evidence establishes that Mr. Benson has significant heart disease and that he has been treated for additional cardiac problems since his October 21, 2007 heart attack that were not related to that heart attack. Dr. Courville attributed

20

Mr. Benson's residual limitations to the 2007 heart attack but conceded it was not definitively established that all those limitations were caused solely by the 2007 heart attack and the delayed cath procedure. Dr. Courville did not deny that Mr. Benson's residual limitations could not have been caused by the heart attack itself and/or contributed to by Mr. Benson's subsequent cardiac problems. Dr. Leleux contradicted Dr. Courville's opinion in many respects and explained the basis and reasoning for his contradictory opinion.

It was the jury's duty to weigh the credibility of the expert's opinions in light of the evidence presented. The jury's damage awards reflect it weighed the opinions of each expert and accepted Dr. Leleux's opinion over Dr. Courville's. Accordingly, we cannot say the awards are abusively low.

The PCF assigns error with the trial court's award to Mr. Benson of $175,000 for loss of earning capacity because Mr. Benson did not request such an award. Mr. Benson admits in his appellate brief that he did not seek an award for loss of earning capacity. Accordingly, the trial court's award of $175,000 for loss of earning capacity is reversed.

## DISPOSITION

The trial court's grant of the Louisiana Compensation Fund's motion in limine, refusing to allow Savoy's "EMTALA – Transfer Policy" to be admitted into evidence is affirmed. The judgment of the trial court is reversed with respect to the award of $175,000 for loss of future earning capacity but affirmed in all other respects. All costs are assessed to the Louisiana Patients' Compensation Fund.

**AFFIRMED IN PART AND REVERSED IN PART.**

21